Colleen BAER, Plaintiff,

v.

**FIRST OPTIONS OF CHICAGO, INCORPORATED, Defendant.**

**Appeal of DAVIS, MINER, BARNHILL & GALLAND, P.C., Appellant,**

v.

**James R. ANTONIONO, Appellee.**

No. 95–1409.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 28, 1995.

Decided Dec. 27, 1995.

Paul Strauss, John F. Belcaster (argued), Davis, Miner, Barnhill & Galland, Chicago, IL, for Davis, Miner, Barnhill & Galland.

George N. Vurdelja, Jr. (argued), Vurdelja & Heaphy, Chicago, IL, for James R. Antoniono.

Before WOOD, Jr., COFFEY and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Attorneys James Antoniono and Paul Strauss dispute the ownership of over $42,000 in attorney's fees earned during their representation of a Title VII plaintiff. The district court, in its approval of a settlement in the underlying Title VII litigation, ordered that the contested fees be deposited with the clerk of the court pending resolution of this dispute. The matter was referred to a magistrate judge who conducted a hearing and recommended that the fees be awarded to Mr. Strauss. The district court did not accept the magistrate's recommendation and instead awarded the fees to Mr. Antoniono. This appeal followed. For the reasons set forth in this opinion, we affirm the judgment of the district court.

## I

## BACKGROUND

### A. *Facts*

This dispute arose out of a Title VII lawsuit brought by Colleen Baer against her employer. Ms. Baer originally was represented in her suit by a Chicago law firm, but she was not satisfied with the representation and sought the advice of another attorney. She contacted James Antoniono, an attorney practicing in Pennsylvania, with whom she and her sister had worked in prior, unrelated litigation. Mr. Antoniono's areas of practice are personal injury, real estate, wills and estates, and some criminal work. He did not have experience in Title VII litigation and thus offered to assist Ms. Baer in finding another attorney.

His search led to Mr. Strauss, a partner at the Chicago law firm of Davis, Miner, Barnhill & Galland ("Davis Miner"), who was experienced in litigating claims such as Ms. Baer's. After an initial meeting with Ms. Baer and Mr. Antoniono, Mr. Strauss agreed to handle Ms. Baer's case.

The three then negotiated a retainer agreement in early 1991. The agreement first set out a contingency fee arrangement between Ms. Baer and her attorneys. Second, the agreement permitted the attorneys to seek a statutory fee multiplier—an additional amount over and above their fees calculated on an hourly rate basis. Third, the agreement set out a "fee-sharing" arrangement between Mr. Strauss and Mr. Antoniono. Although it was understood that Mr. Strauss would do most of the work, Mr. Antoniono was to be compensated for his referral through the fee-sharing arrangement. The arrangement provided that Mr. Antoniono would receive 10% of the first $100,000 recovered in fees and 40% of any amount recovered in excess of $100,000. Pursuant to the Illinois Rules of Professional Conduct, the fee-sharing agreement was put in writing and Ms. Baer gave her written consent to its terms. The agreement was signed by Ms. Baer, Mr. Antoniono and Mr. Strauss in February 1991.

Ms. Baer's case settled in early 1994. During the course of the litigation and settlement, however, a dispute arose between Mr. Antoniono and Mr. Strauss concerning the fees to which each was entitled. The settlement agreement, negotiated by Mr. Strauss on behalf of Ms. Baer, recognized the dispute. Under its terms, the fees for each attorney were calculated by multiplying the number of hours worked by the hourly rate of each.[1] Mr. Antoniono received the full calculated amount of his fees. Davis Miner received all but $50,000 of its calculated fees. In its order approving the settlement and dismissing the case with prejudice, the district court directed that this disputed amount, $50,000, be paid into an escrow account held by the clerk of the court. The amount was subsequently reduced to $42,341. The court then referred the matter to the magistrate judge for resolution.

The magistrate judge held an evidentiary hearing at which both Mr. Antoniono and Mr. Strauss testified and the contours of their dispute unfolded. Mr. Strauss testified that, as Ms. Baer's case progressed toward trial, he had become convinced that her claim was not worth as much as her original estimates.

---

1. The settlement agreement calculated Mr. Strauss' fees at $217,190 and Mr. Antoniono's fees at $24,225.

In fact, he had concluded that she could not prevail on her original damage theory under Title VII. As a result, he came to believe the recovery would be far less than originally predicted; he also testified that he had thought there was a possibility that she might not recover anything at all.

In November 1992, Mr. Strauss, Mr. Antoniono and Ms. Baer met in Chicago to discuss the case. Mr. Strauss believed that Ms. Baer and Mr. Antoniono were being unrealistically optimistic about the possible recovery. Mr. Strauss accordingly told Mr. Antoniono that he did not think that their original fee-sharing agreement was fair, given the lessened prospect of recovery. At that point, testified Mr. Strauss, Mr. Antoniono stated that he did not think it appropriate to discuss fees, and both attorneys exchanged heated comments.

Mr. Strauss testified that he had explained to Mr. Antoniono that the original fee-sharing agreement was premised on the assumption of a high damage award. With a much lower recovery and the fee-sharing agreement, his firm faced the prospect of recovering far less than its usual hourly rate.[2] Mr. Strauss testified that Mr. Antoniono agreed that, instead of the original fee-sharing agreement, each attorney would receive his hours times his hourly rate. Mr. Antoniono testified, however, that he never agreed to change the fee-sharing agreement; in fact, he stated that he made it "crystal clear" to Mr. Strauss that he would not change the terms of their original contract. Tr. at 76–77.

The magistrate judge concluded that the fee-sharing agreement, which the Illinois Rules of Professional Conduct required to be in writing, could be rescinded orally. The magistrate judge found that the parties had agreed orally to rescind the original fee-sharing arrangement and instead had agreed that each would receive compensation for the hours each worked. The magistrate judge therefore recommended that the escrow amount be awarded to Davis Miner.

The district court reviewed the magistrate's report and recommendation de novo, pursuant to Federal Rule of Civil Procedure 72(b). It also reviewed the transcript of the evidentiary hearing and Mr. Antoniono's objections to the magistrate judge's findings. It then determined that Illinois law permitted mutual rescission of a contract, but that the rescission had to be clearly evidenced by the party's conduct. Because it found that Mr. Antoniono did not expressly agree to rescind the written fee-sharing agreement and that his conduct did not clearly evidence his agreement to do so, it held that the fee-sharing agreement had not been rescinded. Finding that there was no clear evidence of rescission, the court awarded the disputed fees to Mr. Antoniono under the terms of the original fee-sharing agreement. The district court never addressed the issue of whether, under Illinois law, a modification or rescission of the fee-sharing agreement had to be in writing.

### B. Contentions of the Parties

Davis Miner claims that the district court's decision should be reversed. First, it submits that the district court wrongly rejected the credibility findings of the magistrate judge; due process requires, it submits, that the district court rehear the testimony of the witnesses before it rejects the magistrate's credibility findings. Davis Miner also submits that Mr. Antoniono is bound by his oral promise to rescind the original fee-sharing agreement and to accept instead his usual hourly rate. The policy concerns that require that fee-sharing agreements be in writing are not present when a fee-sharing arrangement is terminated. Thus the oral rescission of the

---

**2.** A lessened prospect of recovery would affect Mr. Strauss' firm adversely. If, for example, Ms. Baer recovered only $500,000, then her attorneys (under the contingency fee agreement) would receive one-third of this amount. Of this total amount of fees recovered, $166,666, Mr. Antoniono would be entitled (under the fee-sharing agreement) to receive 10% of the first $100,000 ($10,000) and 40% of the excess over $100,000 (40% × $66,666 = $26,666) for a total of $36,-666. Davis Miner would receive $130,000. Mr. Strauss testified that, as of November 1992, his firm had already accumulated more than $160,-000 in fees. The lessened recovery, combined with the fee-sharing agreement, would therefore give his firm less than its hourly rate.

agreement should be given effect and the fees awarded to Davis Miner.

In response, Mr. Antoniono submits that the district court did not reject the credibility findings of the magistrate judge. Rather than choose to believe one witness and disbelieve the other, the district court instead accepted the undisputed evidence presented by both parties and concluded that, under the law of Illinois, there was no clear evidence of rescission. Mr. Antoniono also claims that any rescission or modification of the fee-sharing arrangement must have been in writing; an oral rescission or modification would not have been valid under Illinois law. Therefore, even if Davis Miner's characterization is correct and the parties agreed to rescind the original fee-sharing arrangement, the remaining agreement, which established the contingency fee arrangement, should still have been in writing.

## II

## DISCUSSION

### A. *Jurisdiction*

 We turn first to the issue of jurisdiction. Although neither of the parties has contested the exercise of jurisdiction, "federal judges must respect the limits on their adjudicatory power even if all litigants are content with the decision." *Myers v. County of Lake, Ind.,* 30 F.3d 847, 849 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 666, 130 L.Ed.2d 600 (1994).

The original parties to the underlying litigation are not involved in this dispute; First Options of Chicago and Continental Bank have settled Ms. Baer's claims against them. Remaining before this court are two of the attorneys in the underlying litigation; at issue is the proper distribution of fees for their representation of Ms. Baer. Under these circumstances, the district court's jurisdiction cannot be predicated on the presence of a federal question; the parties' claim is governed by Illinois law. *See* 28 U.S.C. § 1331. Nor can the district court's jurisdiction be rooted in its diversity jurisdiction; although the attorneys are citizens of different states, the amount in controversy does not exceed $50,000. *See* 28 U.S.C. § 1332. For the

reasons set forth in the following paragraphs, however, we hold that this matter is within the supplemental jurisdiction of the district court.

A district court's supplemental jurisdiction is governed by 28 U.S.C. § 1367. We therefore examine this Congressional grant of supplemental jurisdiction to the federal courts. The Judicial Improvements Act of 1990 codified the case law doctrines of "pendent" and "ancillary" jurisdiction under the term "supplemental" jurisdiction:

> (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367. *See Brazinski v. Amoco Petroleum Additives Co.,* 6 F.3d 1176, 1182 (7th Cir.1993) ("The legislative history indicates that the new statute is intended to codify rather than to alter the judge-made principles of pendent and pendent party jurisdiction, and this is also the view of the courts and the commentators.") (citing *Wentzka v. Gellman,* 991 F.2d 423, 425 n. 1 (7th Cir.1993)).

Section 1367 grew out of a recommendation by the Federal Courts Study Committee ("the Committee") that Congress codify the supplemental jurisdiction of the federal courts. The Committee viewed the Supreme Court's decision in *Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), which limited the federal courts' supplemental jurisdiction over pendent party claims, as undermining supplemental jurisdiction generally. Federal Courts Study Committee, Working Papers and Subcommittee Reports 552–56 (July 1, 1990). Although the Committee recognized that limiting supplemental jurisdiction would reduce the case-

load of the federal courts, such a reduction, in its opinion, would be undesirable because it would force a litigant to choose from undesirable alternatives. The litigant could bring his entire case in state court, assuming that the state's joinder rules permitted the federal claim to be heard; but this course could deprive the federal forum of the opportunity to hear important questions of federal law. Alternatively, the litigant could split his case between the state and federal courts, thereby wasting resources with dual litigation and creating complex questions of issue preclusion. *Id.* at 556–58, 109 S.Ct. at 2010–12. The Committee therefore recommended that Congress expressly authorize the federal courts to exercise supplemental jurisdiction. *Id.* at 559, 109 S.Ct. at 2012.

The statutory language proposed by the Committee would have authorized supplemental jurisdiction over any claim arising out of the same "transaction or occurrence" as a claim within federal jurisdiction. Report of the Federal Courts Study Committee 47 (April 2, 1990). This language was contained in the original House version of the bill.[3] The final version, significantly, rejected the "transaction or occurrence" standard for determining the scope of supplemental jurisdiction. Rather, the enacted statute authorizes supplemental jurisdiction coextensive with the "case or controversy" requirement of Article III.

■ Unlike the situation with respect to the district courts' diversity jurisdiction, there is no gap, in the case of supplemental jurisdiction, between constitutional limitations and the statutory authorization. The statute's language clearly authorizes the district courts to exercise jurisdiction to the full extent of Article III's "case or controversy"

requirement. *Brazinski,* 6 F.3d at 1181. The legislative history of § 1367 confirms that Congress intended to authorize the full constitutional limit of supplemental jurisdiction. This court has previously recognized that, through § 1367, Congress has made the two coextensive. In *Brazinski,* we wrote:

> The statute extends the jurisdiction of the federal district court to all claims sufficiently related to the claim on which its original jurisdiction is based to be part of the same case or controversy within the meaning of Article III of the Constitution. If a claim is close enough to the federal (or other) claim that confers federal jurisdiction to be part of the same case, there is no constitutional bar to the assumption of federal jurisdiction over the claim, because Article III confers federal jurisdiction over cases or controversies rather than over claims; and the new statute goes to the constitutional limit.

*Id.* Although the statute ·grants the full extent of Article III's jurisdiction to the district courts, it does not attempt to define explicitly the outer limits of that constitutional limitation on jurisdiction.[4] In *Ammerman v. Sween,* 54 F.3d 423 (7th Cir.1995), we described this limitation in these terms:

> [J]udicial power to hear both state and federal claims exists where the federal claim has sufficient substance to confer subject matter jurisdiction on the court, and the state and federal claims derive from a common nucleus of operative facts. A loose factual connection between the claims is generally sufficient.

*Id.* at 424 (citations omitted).

Applying this general principle to the dispute before us, we note that supplemental jurisdiction generally has been asserted over

---

3. The proposed House Bill stated:
 (1) In any civil action of which the district courts have original jurisdiction, including an action removed from a State court, any party or person may assert a non-Federal claim against any person or other party if
 (A) the Federal claim in the original complaint is not insubstantial; and
 (B) the original Federal claim and the non-Federal claim arise out of the same transaction or occurrence or series of transactions or occurrences.
 H.R. 5381, 101st Cong., 2d Sess. § 120 (1990).

4. The legislative history does indicate, however, that Congress understood the scope of Article III's "case or controversy" requirement to have been set out in *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). H.Rep. No. 734, 101st Cong., 2d Sess. 29 n. 15 (1990), *reprinted in* 1990 U.S.S.C.A.N. 6860, 6875 n. 15 ("[S]ubsection (a) codifies the scope of supplemental jurisdiction first articulated by the Supreme Court in *United Mine Workers v. Gibbs....*").

attorney's fee disputes when the disagreement arises between the client and the lawyer.[5] As we have noted already, however, in this case, the original parties to the underlying litigation are no longer involved; this dispute involves the attorneys who represented the plaintiff. Two other circuits have considered such a situation. In *Grimes v. Chrysler Motors Corp.*, 565 F.2d 841 (2d Cir.1977), the district court's jurisdiction over the underlying litigation (a personal injury claim) was based on the diversity of the parties. Following settlement of the case, a dispute arose between the attorney of record and trial counsel concerning the proper allocation of the settlement proceeds. At the request of the attorney of record, the district court deposited the disputed funds in its registry. It then conducted a hearing on the matter and disbursed the funds according to its findings. On appeal, the trial counsel argued that the district court lacked subject matter jurisdiction to supervise the distribution of the settlement funds. He argued that the issue was simply a contract dispute between two New York residents and did not properly belong before the district court.

The Second Circuit affirmed the district court's exercise of ancillary jurisdiction over the fee dispute. It held that a "district court acquires jurisdiction of a case or controversy as an entirety, and may, as an incident to the disposition of a matter properly before it, possess jurisdiction to decide other matters raised by the case of which it could not take cognizance were they independently present-

ed." *Grimes*, 565 F.2d at 844 (quoting Charles A. Wright, *Federal Courts* § 9 at 19 (1970)). The court also relied upon *Fulton National Bank of Atlanta v. Hozier*, 267 U.S. 276, 45 S.Ct. 261, 69 L.Ed. 609 (1925), which held that the exercise of ancillary jurisdiction is appropriate where the subsidiary controversy "has direct relation to property or assets actually or constructively drawn into the court's possession or control by the principal suit." *Id.* at 280, 45 S.Ct. at 262.[6] Under this precedent, concluded the Second Circuit, the district court's distribution of the settlement fund "was clearly ancillary to its approval of the settlement of the case." *Grimes*, 565 F.2d at 844.

The Fourth Circuit has also addressed a similar situation. In *Taylor v. Kelsey*, 666 F.2d 53 (4th Cir.1981), as here, two attorneys were serving as co-counsel in a district court action. One of the attorneys terminated his association, and the second asserted that he was entitled to one-third of the contingent fee. The district court concluded that the dispute was outside its ancillary jurisdiction for several reasons: The dispute bore no relationship to the underlying litigation; it had no effect upon the litigants or the outcome of their case; the court did not have control over the funds in controversy; and neither judicial economy nor fairness militated in favor of federal jurisdiction. The Fourth Circuit agreed with the district court that the fee dispute between the two attorneys

5. *See, e.g., Cluett, Peabody & Co. v. CPC Acquisition Co.*, 863 F.2d 251 (2d Cir.1988) (holding exercise of ancillary jurisdiction proper over a dispute between a law firm and its client concerning fees); *Novinger v. E.I. DuPont de Nemours & Co., Inc.*, 809 F.2d 212 (3d Cir.) (holding that ancillary jurisdiction existed over attorney-client fee dispute arising out of a lawsuit based on diversity jurisdiction), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987); *Jenkins v. Weinshienk*, 670 F.2d 915 (10th Cir. 1982) (holding ancillary jurisdiction existed to determine legal fees a party to lawsuit owes its attorney with respect to the litigation before the court); *United States v. Ford*, 650 F.2d 1141 (9th Cir.1981) (holding attorneys fees dispute ancillary to underlying action), *cert. denied*, 455 U.S. 942, 102 S.Ct. 1437, 71 L.Ed.2d 654 (1982); *Valerio v. Boise Cascade Corp.*, 645 F.2d 699 (9th Cir.) (holding that ancillary jurisdiction existed over claims of fraud against class attorneys

whose fees were awarded as part of settlement), *cert. denied*, 454 U.S. 1126, 102 S.Ct. 976, 71 L.Ed.2d 113 (1981). *But see Broughten v. Voss*, 634 F.2d 880 (5th Cir.1981) (holding that district court did not have jurisdiction to resolve fee dispute between party and withdrawing counsel); *Bounougias v. Peters*, 369 F.2d 247 (7th Cir.1966) (holding that no ancillary jurisdiction existed to hear claim by client against attorneys), *cert. denied*, 386 U.S. 983, 87 S.Ct. 1288, 18 L.Ed.2d 232 (1967).

6. We note that this formulation in *Fulton* has recently been criticized by the Supreme Court as "provid[ing] an excessively limited description" of the doctrine of ancillary jurisdiction. *See Kokkonen v. Guardian Life Ins. Co.*, —— U.S. ——, ——, 114 S.Ct. 1673, 1676, 128 L.Ed.2d 391 (1994).

did not arise as a matter of necessity from anything which occurred in the proceedings of [the underlying litigation], nor did the district court have control over the fee in the sense that the court was required to establish and distribute a fee. Instead, the controversy arose purely from a private contract dispute between two Virginia residents. Under these circumstances, we see no basis for ancillary jurisdiction.

*Id.* at 54.

■ Although the facts before the *Taylor* court required a different result, the approach of the Second Circuit and the Fourth Circuit are quite compatible. Our case is much more similar to the situation that was before the Second Circuit in *Grimes.* Here, in contrast to *Taylor,* the district court exercised affirmative control over the disputed fee. The settlement agreement, which was brought to the district court for its approval and for an order dismissing the case, specifically acknowledged the dispute and included a provision for resolving it.[7] The court had jurisdiction to approve the parties' independently negotiated settlement, and that jurisdiction of necessity encompassed the terms of the settlement agreement. We thus conclude that the court did not overreach its authority to resolve the dispute concerning the fees. Moreover, the underlying litigation was a Title VII case, and Title VII vests in the district court broad authority to award attorney's fees to the prevailing party. 42 U.S.C. § 2000e–5(k). This authority over fees is not extinguished by the parties' settlement of their case; a district court may decline to approve a settlement if it determines that the amount of fees set by the parties is unreasonable. *Foster v. Boise–Cascade, Inc.,* 577 F.2d 335 (5th Cir.1978).

Under these circumstances, we hold that this dispute was part of the same "case or controversy" as the underlying litigation. The district court, therefore, had supplemental jurisdiction to hear this dispute.[8]

## B. *The Fee–Sharing Agreement*

■ We now turn to the merits of the case before us. The parties bring a claim governed by Illinois law and by the Illinois Rules of Professional Conduct. When determining issues under Illinois law, we apply the law that would be applied in this context by the Illinois Supreme Court. *Green v. J.C. Penney Auto, Ins. Co.,* 806 F.2d 759, 761 (7th Cir.1986). We are obliged to consider the holdings of state appellate courts, but are not bound to do so if we have good reasons for diverging from those decisions. *See Eljer*

7. We note that our holding in this case conforms to the Supreme Court's discussion of supplemental jurisdiction in *Kokkonen v. Guardian Life Insurance,* —— U.S. ——, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). In that case, the parties had filed a stipulation of dismissal signed by all parties, pursuant to Federal Rule of Civil Procedure 41(a)(1)(ii). A month later, one of the parties filed a motion with the district court, requesting that the court enforce the terms of the settlement agreement. The Supreme Court noted that the district court's order dismissing the suit did not incorporate the terms of the settlement agreement or contain a provision retaining jurisdiction over the enforcement of the agreement. The Court held that no federal jurisdiction existed over the enforcement of the settlement terms. *Id.* at ——, 114 S.Ct. at 1677.

The Court distinguished, however, between a dismissal by stipulation of the parties pursuant to Rule 41(a)(1)(ii) and a dismissal by order of the court pursuant to Rule 41(a)(2). Under Rule 41(a)(2), an action "shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper." The Court noted that a district court may, in its discretion, set forth as one of the terms of its order its continuing jurisdiction over the settlement agreement. *Id.*

The matter before this court is one in which the district court set forth the "terms and conditions as [it deemed] proper" to resolve the issue remaining before it. The district court's order dismissing Ms. Baer's lawsuit specifically retained jurisdiction over the fee dispute between Mr. Antoniono and Mr. Strauss. In fact, it ordered that the funds be deposited with the clerk of the court and set forth a mechanism by which the dispute would be resolved. Thus, this affirmative control over the manner in which the dispute would be resolved and the funds distributed, we hold, brings the matter squarely within the court's supplemental jurisdiction.

8. Because neither party has challenged the district court's exercise of its supplemental jurisdiction, it is sufficient to decide that supplemental jurisdiction existed. We need not determine whether the court's decision to exercise that discretion was appropriate. *See Myers v. County of Lake, Ind.,* 30 F.3d 847 (7th Cir.1994) (refraining from reviewing the district court's discretion in exercising jurisdiction because neither party challenged it).

*Mfg., Inc. v. Liberty Mut. Ins. Co.*, 972 F.2d 805, 814 (7th Cir.1992), *cert. denied,* 507 U.S. 1005, 113 S.Ct. 1646, 123 L.Ed.2d 267 (1993). The magistrate judge before whom this case first was heard determined that, under Illinois law, the original fee-sharing agreement could be rescinded orally. The district court did not reach that issue because it found no clear evidence of rescission. Because the disposition of this appeal requires that we determine issues of Illinois law, we must decide these issues de novo. *Salve Regina College v. Russell,* 499 U.S. 225, 231, 111 S.Ct. 1217, 1220–21, 113 L.Ed.2d 190 (1991).

### 1

The Illinois Rules of Professional Conduct regulate fee-sharing agreements. The Illinois Supreme Court has made clear that its standards of professional behavior, currently embodied in the Illinois Rules of Professional Conduct,[9] bind the courts as a matter of law. *In re Vrdolyak,* 137 Ill.2d 407, 148 Ill.Dec. 243, 248, 560 N.E.2d 840, 845 (1990) ("As an exercise of this court's inherent power over the bar and as rules of court, the Code operates with the force of law."). To determine the proper application of a rule, we examine its language, structure, and the purposes that it serves.

Rule 1.5(f)-(h) sets forth the standards concerning all fee-sharing arrangements between attorneys who are not members of the same firm. Specifically, it states:

(f) Except as provided in Rule 1.5(j), a lawyer shall not divide a fee for legal services with another lawyer who is not in the same firm, unless the client consents to employment of the other lawyer by signing a writing which discloses:

(1) that a division of fees will be made;

(2) the basis upon which the division will be made, including the economic benefit to be received by the other lawyer as a result of the division; and

(3) the responsibility to be assumed by the other lawyer for performance of the legal services in question.

(g) A division of fees shall be made in proportion to the services performed and responsibility assumed by each lawyer, except where the primary service performed by one lawyer is the referral of the client to another lawyer and

(1) the receiving lawyer discloses that the referring lawyer has received or will receive economic benefit from the referral and the extent and basis of such economic benefit, and

(2) the referring lawyer agrees to assume the same legal responsibility for the performance of the services in question as would a partner of the receiving lawyer.

(h) The total fee of the lawyers shall be reasonable.

Illinois Rules of Professional Conduct Rule 1.5(f)–(h). Rule 1.5(f) initially states a general prohibition of fee-sharing between attorneys who are not members of the same firm. This prohibition is followed by a description of the limited circumstances in which such arrangements are allowed: only when the client consents in writing to the arrangement. Rule 1.5 also establishes the general rule concerning the terms of any such division. Rule 1.5(g). Agreements to divide fees "shall be made in proportion to the services performed and responsibility assumed by each lawyer." It is clear that all agreements to divide fees, including those in which attorneys agree to receive compensation in proportion to their efforts, must comply with the writing requirement of Rule 1.5(f). That requirement mandates that the client sign a written consent to the arrangement which discloses three matters: (1) that a division of fees will be made; (2) the basis upon which the division of fees will be made; and (3) the responsibility assumed by each attorney. Moreover, one additional requirement governs all fee agreements: Rule 1.5(h) mandates that the total fee of the lawyers shall be reasonable.

---

9. The Illinois Supreme Court, in 1980, originally established the Illinois Code of Professional Responsibility to govern the professional behavior of the bar. The Code was repealed effective August 1, 1990 and replaced with the Illinois Rules of Professional Conduct.

### 2

■ Within the realm of all possible fee-sharing arrangements, Rule 1.5(g) singles out those based upon referrals.[10] Referral-based fee-sharing agreements are excepted from the general rule that any division of fees shall be made in proportion to the services performed and responsibility assumed by each lawyer. Because of the recognition that in some cases this arrangement may be beneficial to a client, the referring attorney is permitted, under the exception of Rule 1.5(g), to recover an amount disproportionate to the services performed. It is clear that a referral agreement is still a "division of fees" and still subject to the writing requirement; it is simply one in which an attorney may recover more than his proportionate amount. In the case of referral-based fee-sharing, Rule 1.5(g) imposes two requirements. First, the "extent and basis" of the economic benefit received by the referring lawyer must be disclosed. And second, the referring lawyer must agree to assume the same responsibility for the client's representation as would a partner of the receiving lawyer.

### 3

■ Turning to the facts of this case, it is clear that the original agreement between Mr. Strauss and Mr. Antoniono was subject to the special requirements of Rule 1.5(g). Mr. Antoniono referred Ms. Baer to Mr. Strauss with the understanding that Mr.

10. The history of fee-sharing agreements in Illinois explains the reason for their special treatment within the Rules of Conduct. Prior to the Illinois Supreme Court's adoption of the Code of Professional Conduct in 1980, fee-sharing agreements based solely upon a client referral were unenforceable on public policy grounds; a division of fees would be permitted only if made "in proportion to the services performed and responsibility assumed by each." *Holstein v. Grossman*, 246 Ill.App.3d 719, 186 Ill.Dec. 592, 601, 616 N.E.2d 1224, 1233 (1993) (quoting the ABA Model Code, DR 2–107 (1980)). Fee-sharing based upon referral alone was disfavored by Illinois public policy, primarily because such agreements create the possibility that a client's rights may be adversely affected. One Illinois court summed up the case against referral fees in this manner:

> It is evident ... that attorneys have long been ethically and legally prohibited from sharing with other members of the profession fees generated from the disposal of a legal matter when the only "service" rendered by the claimant attorney is the referral of the case. Profiting from the solicitation of professional employment is injurious to the legal profession and to the public. As the various authorities reveal, this practice is injurious to the legal profession since the public loses confidence in those who treat clients as merchandise in a marketplace rather than the recipients of the attorneys' skills and abilities. More importantly, the best interest[s] of the client are jeopardized by the arrangements when it becomes more profitable for attorneys to sell clients than to give them a legal service.

*Corti v. Fleisher*, 93 Ill.App.3d 517, 49 Ill.Dec. 74, 85, 417 N.E.2d 764, 775 (1981). Additionally, if an attorney must share a portion of the fees received from certain clients, but not others, he may be tempted to devote less time and attention to the cases of the clients whose fees must be shared; the client, as a result, may not receive the best efforts of his attorney on his case. *O'Hara v. Ahlgren, Blumenfeld & Kempster*, 127 Ill.2d 333, 130 Ill.Dec. 401, 406, 537 N.E.2d 730, 735 (1989); *see also Leoris v. Dicks*, 150 Ill. App.3d 350, 103 Ill.Dec. 584, 587, 501 N.E.2d 901, 904 (1986).

In 1980, the ABA Model Rules prohibited referral-based fee-sharing outright. With the enactment of the Illinois Code of Professional Responsibility Rule 2–107 in 1980, the Illinois Supreme Court departed from the ABA rules and expressly sanctioned fee-sharing agreements based solely on a referral. The Committee Comments to Rule 2–107 (the precursor to the current Rule 1.5) indicate the reasons for moving from a blanket prohibition of referral-based fee-sharing to the approval of such arrangements under certain circumstances:

> To require actual participation in a case before a fee may be earned discourages some lawyers from referring cases they know could be better handled by another. This is not in the interest of the client or the lawyer. Currently, referring lawyers are sometimes given make-work tasks after referral to "earn" a fee. This practice does not encourage the efficient delivery of legal services and may drive up legal fees. The public is best served by encouraging lawyers to refer matters to those more skilled in a particular area by permitting them to earn a referral fee *so long as there is full disclosure to the client and responsibility is maintained by the referring lawyer.*

Rule 2–107, Committee Comments, at 625 (emphasis added). As indicated by the Committee Comments, this approval was accompanied by specific requirements designed to protect the client: informed consent by the client and assumption of responsibility by the attorney. Rule 2–107(a)(2)(a)–(b) (1980). Rule 2–107(a)–(c) of the Illinois Code of Professional Responsibility was replaced in 1990 with Rule 1.5(f)–(j) of the Illinois Rules of Professional Conduct. *See The New Illinois Rules of Professional Conduct: An Annotated Edition* 8 (1991).

Strauss was to do most of the work: [He] was chosen because of his familiarity with Title VII litigation and because of Mr. Antoniono's lack of experience in the area. Mr. Antoniono's role, as he understood it, was quite limited; he stated that his job was "holding the client's hand." Tr. at 53. This arrangement was exactly what Rule 1.5 was intended to permit. Ms. Baer received the benefit of a local attorney experienced in litigating her claim and Mr. Antoniono was to be compensated for his care in searching out counsel on her behalf. Following the Rule's purpose of informing and protecting clients, Ms. Baer was made fully aware of the arrangement between her two attorneys and gave her informed consent to their fee-sharing arrangement. Indeed, the fee arrangement was part of the retainer agreement and Ms. Baer evidenced her consent by signing the agreement. Because the service rendered by Mr. Antoniono was primarily a referral, Rule 1.5(g) permitted the attorneys to depart from the general rule of proportionality and to agree to share fees in a manner disproportionate to the amount of work expended by each.

Mr. Strauss submits that the alleged oral agreement between himself and Mr. Antoniono, made in November 1992, rescinded the original fee-sharing agreement and substituted in its place an agreement not to share fees. Instead, each attorney would be entitled to his hourly rate. In Mr. Strauss' view, the attorneys no longer had a fee-sharing agreement. Therefore, Rule 1.5 did not mandate that the new agreement be in writing.

We do not believe that Mr. Strauss' interpretation can be squared with the plain wording of Rule 1.5. Rule 1.5(f)–(g) clearly indicates that all fee-sharing agreements between attorneys who are not in the same firm must be committed to writing and approved by the client. The rule contemplates that most such agreements will involve attorneys who divide fees on the basis of their efforts; the only fee-sharing agreements which are not governed by this general rule and which fall within the ambit of the special rule set forth in Rule 1.5(g) are those based upon referral. Although the alleged change altered the attorneys' agreement to one in which each lawyer received compensation based on effort, the agreement remains within the ambit of Rule 1.5 because, even after the alleged alteration, the substituted contract was no less a division of fees within the meaning of Rule 1.5. The substituted agreement, by its own terms, is an agreement between lawyers to split the fee in the case. The fee will still be divided; it simply will be divided under a different formula.

█ Any other interpretation would frustrate the purpose of Rule 1.5. The writing requirement set forth in Rule 1.5(f) is for the protection and benefit of the client. *Hofreiter v. Leigh,* 124 Ill.App.3d 1052, 80 Ill.Dec. 319, 322, 465 N.E.2d 110, 113 (1984) ("The purpose of Rule 2–107(a)(1) [present Rule 1.5(f) ] is to serve the best interest of the client."). It is only after notice is given to the client and the client gives informed consent that such agreements will be enforced. When attorneys fail to inform their clients of fee-sharing arrangements and do not commit such arrangements to writing, the arrangements have not been enforced by Illinois courts. *See Holstein v. Grossman,* 246 Ill. App.3d 719, 186 Ill.Dec. 592, 616 N.E.2d 1224 (1993); *Anderson v. Anchor Org. for Health Maintenance,* 274 Ill.App.3d 1001, 211 Ill. Dec. 213, 654 N.E.2d 675 (1995). This court has also recognized the requirement of Rule 1.5(f) that all fee-sharing agreements be committed to writing and approved by the client. *Kaplan v. Pavalon & Gifford,* 12 F.3d 87 (7th Cir.1993) ("In Illinois, a fee-sharing agreement between attorneys for referrals, which is neither in writing nor signed by the client, is unenforceable as a matter of public policy."). As *Anderson* makes clear, this precedent cannot be read as limited to only a particular subset of referral agreements— those in which fees are shared disproportionately; they too are subject to the writing and disclosure requirements of Rule 1.5.

█ In this case, the attorneys had informed Ms. Baer of their referral agreement and had received her written consent to the arrangement. Indeed, she had signed the agreement which was incorporated in the original retainer agreement. Their subsequent alleged oral agreement was without

her written consent. Indeed, as far as this record reflects, it was without her consent at all. It was, moreover, not simply a rescission of the earlier written agreement; it was the substitution of another fee-sharing agreement and therefore, quite independently of its relationship to the earlier agreement, it was necessary, under the explicit provisions of Rule 1.5(g), that it be in writing. Rule 1.5(f)–(g) exists to inform and protect the client; fee-sharing, whether in a referral context or otherwise, is permitted only after the client consents. Rule 1.5's policy and language require that, before an agreement establishing a division of fees is valid, the client must consent, in writing, to the change. No such written consent was ever given by Ms. Baer to the revised fee-sharing agreement allegedly entered into by her attorneys.[11]

Accordingly, we must conclude that, even if Mr. Antoniono agreed to a revised fee-sharing arrangement with Mr. Strauss, the agreement could not be enforced because Ms. Baer never gave her written consent to it. In the absence of a writing memorializing the revised agreement, the only agreement to be enforced is the original fee-sharing arrangement. Under its terms, Mr. Antoniono is entitled to the fees currently held in escrow.

### Conclusion

For the foregoing reasons, we conclude that the district court correctly awarded the disputed fees to Mr. Antoniono. Accordingly, the judgment of the district court is affirmed.

AFFIRMED.

---

11. The magistrate judge's report and recommendation suggested in passing that the settlement agreement between Ms. Baer and her employers, which was signed by Ms. Baer, would comply with the writing requirement of Rule 1.5. We cannot accept this suggestion. Although Ms. Baer did give her written consent to the terms of the settlement agreement and although the agreement awards fees to her attorneys, it specifically leaves open the issue of the disputed fees: It recognized that $50,000 of the fees were in dispute and therefore provided that the disputed amount should be put in escrow until the disagreement was resolved. The settlement agreement, therefore, did not meet the writing requirement of Rule 1.5.