CROCKETT & MYERS, LTD., a Nevada Corporation, and J.R. Crockett, Jr., Esq., an individual, Plaintiffs,

v.

NAPIER, FITZGERALD & KIRBY, LLP, a New York limited liability law partnership, and Brian P. Fitzgerald, Esq., an individual, Defendants.

Napier, Fitzgerald & Kirby, LLP, a New York limited liability law partnership, and Brian P. Fitzgerald, Esq., an individual, Counterclaimants,

v.

Crockett & Myers, Ltd., a Nevada Corporation, and J.R. Crockett, Jr., Esq., an individual, Counterdefendants.

No. CV–S–05–0877PMP(PAL).

United States District Court, D. Nevada.

Nov. 23, 2005.

Samuel S. Lionel, Lionel, Sawyer & Collins, Las Vegas, NV, for Crockett & Myers, Ltd., J.R. Crockett, Jr., Plaintiffs.

Mark A. Hutchison, Hutchison & Steffen, Scott A Flinders, Hutchison & Steffen, Las Vegas, NV, for Brian P. Fitzgerald, Napier, Fitzgerald & Kirby, LLP, Defendants.

## ORDER

PRO, Chief Judge.

On January 15, 2001, Michael Nostro died while undergoing a CT scan-guided needle biopsy in Nevada. On or about June 5, 2001, Michael Nostro's wife, Wende Nostro retained Brian P. Fitzgerald, Esq., to investigate the death of her husband in Nevada and to determine whether a viable medical malpractice claim existed. Mr. Fitzgerald is an attorney licensed to practice law in the State of New York and a member of Napier Fitzgerald & Kirby, L.L.P., a limited liability law partnership engaged in the practice of law in New York.

On or about June 28, 2001, Mr. Fitzgerald contacted Nevada attorney J.R. Crockett, Jr., Esq., to participate in the investigation and evaluation of the Nostro medical malpractice claim. Mr. Crockett is a partner in Crockett & Myers, Ltd., a professional corporation engaged in the practice of law in Nevada.

This action arises from a dispute between Plaintiffs/Counterdefendants Crockett & Myers, Ltd., and J.R. Crockett, Jr., Esq., (collectively "Crockett"), and Defendants/Counterclaimants Napier, Fitzgerald & Kirby, L.L.P., and Brian P. Fitzgerald, Esq., (collectively "Fitzgerald"), regarding the division of contingent attorneys' fees recovered as a result of the Nostro litigation.

The record before the Court indicates that commencing sometime in June 2001,

Crockett and Fitzgerald agreed that Crockett would represent Nostro at a contingency rate of 33⅓% as opposed to Crockett's usual 40% rate. Additionally, Crockett and Fitzgerald agreed that Fitzgerald would act as co-counsel on the case, and Crockett and Fitzgerald would split equally all attorneys' fees. On August 13, 2001, Crockett, Fitzgerald, and Nostro signed an Attorney Retainer Agreement ("Agreement") (Pls.' Compl., Ex. 1) drafted by Crockett. Under the Agreement, the two law firms assumed joint responsibility for handling Nostro's and the estate's medical malpractice claims. Fitzgerald claims that his firm subsequently provided legal advice and service on the case, including gathering pertinent medical records, and researching various theories of liability.

In July 2002, Crockett submitted the Nostro case to the then-existing Nevada medical legal screening panel, and on January 3, 2003, filed a complaint on behalf of Nostro in Nevada State Court. On June 25, 2003, Wende Nostro sent a letter to Fitzgerald advising him that he and his law firm were discharged from any further representation on Nostro's behalf. (Pls.' Compl., Ex. 3.) Over a year later, Crockett negotiated a settlement of the Nostro case, and in accord with the Retainer Agreement, collected one-third of the settlement proceeds as contingent attorneys' fees.

By letter dated October 28, 2004, Crockett informed Fitzgerald of the settlement and further advised Fitzgerald that because Nostro had terminated Fitzgerald's representation before the settlement was reached, Fitzgerald was entitled only to quantum meruit compensation for the time he had worked on the matter. (Pls.' Compl., Ex. 6.) In response, Fitzgerald demanded payment of 50% of the recovered attorneys' fees under the Retainer Agreement, which Crockett has refused to pay.

On May 24, 2005, Crockett filed a Complaint in the Eighth Judicial District Court in and for the County of Clark, State of Nevada, seeking a declaration that Fitzgerald is entitled only to "a quantum meruit recovery for the hours they worked early on in the Nostro case ..." and for a monetary judgment to Fitzgerald consistent with a quantum meruit award.

On July 20, 2005, Defendants/Counterclaimants Fitzgerald removed Crockett's action to this Court (Doc. # 1), and on July 27, 2005, filed an Answer and Counterclaim (Docs.# 3, # 4) alleging counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, declaratory relief, and constructive trust.

Presently before this Court is Crockett's Motion to Dismiss Fitzgerald's Counterclaims Pursuant to FRCP 12(b)(6) (Doc. # 7), filed on August 19, 2005. Fitzgerald filed an Opposition (Doc. # 13) on September 12, 2005, and Crockett filed a Reply (Doc. # 15) on September 23, 2005. On November 4, 2005, the Court conducted a hearing regarding Crockett's Motion to Dismiss.

## I. LEGAL STANDARD

■ Fitzgerald attaches various exhibits to the opposition and requests the Court treat Crockett's Motion to Dismiss as a Motion for Summary Judgment. The Court will not do so. Crockett did not attach any exhibits to the original motion that would warrant converting the motion to dismiss to one for summary judgment. Additionally, to the extent any issues of fact affect the Court's analysis, on a motion to dismiss standard the Court will view the facts in the light most favorable to Fitzgerald as the non-moving party, and thus the failure to convert the motion to one for summary judgment will not prejudice Fitzgerald.

In considering a motion to dismiss, "all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party." *Wyler Summit P'ship v. Turner Broad. Sys., Inc.,* 135 F.3d 658, 661 (9th Cir.1998) (citation omitted). However, the Court does not necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations in the plaintiff's complaint. *See Clegg v. Cult Awareness Network,* 18 F.3d 752, 754–55 (9th Cir.1994). There is a strong presumption against dismissing an action for failure to state a claim. *See Gilligan v. Jamco Dev. Corp.,* 108 F.3d 246, 249 (9th Cir.1997) (citation omitted). The issue is not whether Plaintiff ultimately will prevail, but whether he may offer evidence in support of his claims. *See id.* at 249 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Consequently, the Court may not grant a motion to dismiss for failure to state a claim "unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Hicks v. Small,* 69 F.3d 967, 969 (9th Cir.1995).

The liberal rules of notice pleading set forth in the Federal Rules of Civil Procedure do not require a plaintiff to set out in detail the facts supporting his claim. *See Yamaguchi v. U.S. Dep't of the Air Force,* 109 F.3d 1475, 1481 (9th Cir.1997) (quoting *Conley v. Gibson,* 355 U.S. at 47, 78 S.Ct. 99). All the Rules require is a "short and plain statement" that adequately gives the defendant "fair notice of what the plaintiffs claim is and the grounds upon which it rests." *Id.* (citations and internal quotations omitted). A claim is sufficient if it shows that the plaintiff is entitled to any relief which the court can grant, even if the complaint asserts the wrong legal theory or asks for improper relief. *See United States v. Howell,* 318 F.2d 162, 166 (9th Cir.1963).

## II. DISCUSSION

### A. Breach of Contract

Fitzgerald asserts Crockett breached, the Retainer Agreement and an oral agreement reached during a telephone conversation to pay 50% of all attorneys' fees upon settlement. Crockett moves to dismiss the counterclaims for breach of contract, arguing Nostro terminated the Retainer Agreement and, while denying any oral argument regarding fees, maintains that even if one existed, an oral agreement between attorneys to split fees without client consent is unenforceable.

### 1. The Retainer Agreement

The Nevada Supreme Court has recognized that the nature of the attorney-client relationship is such that the client has the power to discharge his attorney at any time. *Morse v. Eighth Judicial Dist. Court in and for Clark County,* 65 Nev. 275, 195 P.2d 199, 204 (1948). However, the Nevada Supreme Court has not directly addressed the issue of what compensation an attorney is entitled to when a client discharges an attorney retained under a contingency fee agreement, and the contingency has not yet occurred. "When interpreting state law, federal courts are bound by decisions of the state's highest court." *Strother v. S. Cal. Permanente Med. Group,* 79 F.3d 859, 865 (9th Cir.1996) (quotation omitted). If the state has not addressed the particular issue, a federal court must use its best judgment to predict how the highest state court would resolve it "using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Id.* (quotation omitted); *Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.,* 306 F.3d 806, 812

(9th Cir.2002). "In making that prediction, federal courts look to existing state law without predicting potential changes in that law." *Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1203 (9th Cir.2002). Although federal courts should not predict changes in a state's law, they "are not precluded from affording relief simply because neither the state Supreme Court nor the state legislature has enunciated a clear rule governing a particular type of controversy." *Air–Sea Forwarders, Inc. v. Air Asia Co., Ltd.,* 880 F.2d 176, 186 (9th Cir.1989) (quotation omitted).

Although not directly addressing the issues in this case, the Nevada Supreme Court has indicated that where there is no agreement regarding attorneys' fees, the attorney is entitled to the reasonable value of services performed in quantum meruit, rather than a contingency fee. *See Cooke v. Gove,* 61 Nev. 55, 114 P.2d 87, 88 (1941). Additionally, the Nevada State Bar has issued a non-binding advisory opinion stating that a discharged attorney hired on contingency is entitled to recover in quantum meruit when the discharge occurs after an initial offer of settlement has been made. *See* State Bar of Nevada, Standing Comm. on Ethics and Prof'l Responsibility, Formal Op. No. 18 (Apr. 29, 1994).

Most other state courts that have addressed the issue have held the discharged attorney is entitled to recover in quantum meruit, not on the contingency fee contract. *See, e.g., Malonis v. Harrington,* 442 Mass. 692, 816 N.E.2d 115, 122–23 (2004); *Reid, Johnson, Downes, Andrachik & Webster v. Lansberry,* 68 Ohio St.3d 570, 629 N.E.2d 431, 435 (1994); *Fracasse v. Brent,* 6 Cal.3d 784, 100 Cal. Rptr. 385, 494 P.2d 9, 10–14 (1972); *Martin v. Camp,* 219 N.Y. 170, 114 N.E. 46, 48 (1916). The general rationale for this result is that "[b]ecause the client's power to end the relationship is an implied term of the retainer contract, the modern rule is

that if the client terminates the representation, with or without cause, the client does not breach the retainer contract, and thus, the attorney is not entitled to recover on the contract." *Skeens v. Miller,* 331 Md. 331, 628 A.2d 185, 187 (1993). Courts have found this rule strikes the proper balance between permitting the client to choose counsel freely, and compensating attorneys for work performed:

> The right to discharge is of little value if the client must risk paying the full contract price for services not rendered upon a determination by a court that the discharge was without legal cause. The client may frequently be forced to choose between continuing the employment of an attorney in whom he has lost faith, or risking the payment of double contingent fees equal to the greater portion of any amount eventually recovered. . . . Unless a rule is adopted allowing an attorney as full compensation the reasonable value of services rendered to the time of discharge, clients will often feel required to continue in their service attorneys in whose integrity, judgment or capacity they have lost confidence.

*Fracasse,* 100 Cal.Rptr. 385, 494 P.2d at 12–13.

█ Given Nevada's recognition of the client's power to terminate the attorney/client contract, its rule that absent a fee agreement the attorney can recover the reasonable value of his services, the Nevada State Bar's advisory opinion, and the majority of state courts applying a rule of quantum meruit upon discharge under a contingency agreement, the Court concludes Nevada would adopt a similar rule.

Under this rule, Fitzgerald's only claim against Nostro would be for quantum meruit, and he would not be able to sue on the contingency fee contract. However, Fitzgerald has not sued Nostro. Instead, he has sued Crockett and his firm, arguing

that even though Nostro rescinded the Retainer Agreement as between her and Fitzgerald, the Agreement remained in force as between Fitzgerald and Crockett. The Agreement contains several provisions headed by the words "CLIENT AGREES" or "CLIENT UNDERSTANDS." (Defs.'/Countercls.' Opp'n to Pls.'/Counterdefs.' Mot. to Dismiss Countercls. Pursuant to FRCP 12(b)(6) [Doc. # 13], Ex. A.) However, this language does not precede the fee-splitting provision. (*Id.*) The provision states:

> It is further agreed and understood that the fees paid to the ATTORNEYS at the time of settlement shall be divided equally between CROCKETT & MYERS and BRIAN FITZGERALD, ESQ.

(*Id.*) Based on this language, Fitzgerald asserts the fee provision stands alone between the attorneys, and Nostro's termination of Fitzgerald does not affect the provision.

■ The Agreement contains no explicit language indicating the fifty-fifty split provision would survive termination of the Agreement. The Agreement discusses what would happen in the event of termination in only one paragraph in which it states that if any party terminated the Agreement while an offer was pending, the attorneys would have a 33⅓% lien on the settlement proceeds. (*Id.*) The Agreement is otherwise silent on what would happen in the event of termination, and no language in the Agreement suggests that the fifty-fifty fee split remains in effect even if the client terminates one of the firms. Once Nostro discharged Fitzgerald, the contingency fee agreement ceased to have force and effect. Absent explicit contractual language to the contrary, the fee-splitting arrangement did not survive termination of the rest of the contract. This result comports with both the contract's language and the usual policy concerns associated with fee splitting between attorneys. If Nostro discharged Fitzgerald and yet he still was entitled to 50% of all fees, Crockett may have been less likely to invest the time and resources to vigorously pursue the claim, knowing half of the fruits of his efforts would go to an attorney no longer representing Nostro or assuming any responsibility for the case. Accordingly, the Court finds Crockett did not breach the Retainer Agreement by refusing to pay Fitzgerald 50% of the recovered fees because Nostro's discharge of Fitzgerald terminated that Agreement.

### 2. Oral Agreement

Fitzgerald also asserts that during a June 2001 telephone conversation with Crockett, the attorneys orally agreed Fitzgerald would get 50% of the fees in payment for referring Nostro to Crockett & Myers. Crockett denies the parties entered into such an agreement, and argues that even if they did, it would be unenforceable because Nevada's attorney discipline rules prohibit fee splitting without client consent. Fitzgerald responds that the oral agreement is not illegal because Nostro later agreed in the Retainer Agreement to the fee split. Fitzgerald further argues that even if it is illegal, the Court should enforce the agreement because Crockett is the Nevada attorney bound by Nevada's ethical rules, and he should not be permitted to benefit from his own illegal conduct. In reply, Crockett notes that Fitzgerald is bound by similar ethical rules as an attorney licensed to practice law in the State of New York, and that even assuming the alleged agreement existed, both attorneys would be in violation of the ethical rules that apply in the states in which they are admitted to practice.

As an initial matter, the Court notes that Fitzgerald's Countercomplaint does not specify that the attorneys entered into

a referral fee arrangement. The Counter-complaint states the following:

> In or about June 2001, Mr. Fitzgerald contacted counterdefendant Crockett of Crockett & Myers, Ltd., and Mr. Fitzgerald and counterdefendant Crockett agreed that Fitzgerald[ and] Crockett & Myers limited would represent Mrs. Nostro at a reduced attorneys' contingent fee of 33⅓% (reduced from the standard 40% charged by Crockett), that Fitzgerald and Napier, Fitzgerald & Kirby, LLP would act as co-counsel on the case, and that all attorney's fees would be divided equally between Mr. Fitzgerald and counterdefendant Mr. Crockett.

Defs. Countercl. [Doc. # 4] at ¶ 10. This paragraph does not allege a straight referral fee; rather it alleges the attorneys agreed to joint representation with an equal split of fees. At the hearing conducted November 4, 2005, Fitzgerald argued that if this paragraph insufficiently alleged a referral fee agreement, he should be permitted to amend his counterclaim to include those allegations.

A plaintiff may amend his or her complaint once "as a matter of course at any time before a responsive pleading is served ...." Fed.R.Civ.P. 15(a). " 'A motion to dismiss is not a "responsive pleading" within the meaning of the rule.' " *St. Michael's Convalescent Hosp. v. State of Cal.,* 643 F.2d 1369, 1374 (9th Cir.1981) (quoting *Nolen v. Fitzharris,* 450 F.2d 958, 958 (9th Cir.1971)).

Because no responsive pleading has been filed, Fitzgerald insists he is entitled to amend the Countercomplaint as of right. For purposes of resolving the instant motion to dismiss, the Court will assume that Fitzgerald would amend the Countercomplaint to include allegations that during the June 2001 telephone conversation, Fitzgerald and Crockett orally agreed for

a referral fee in the amount of one-half of the fees generated in the Nostro case.

■ Nevada recognizes the rule that "traditionally neither courts of law nor equity will interpose to grant relief to parties to an illegal agreement." *Shimrak v. Garcia–Mendoza,* 112 Nev. 246, 912 P.2d 822, 825–26 (1996). In accord with this rule, many state courts have refused to enforce attorney fee-splitting agreements that do not comport with that state's ethical rules. *See Baer v. First Options of Chicago, Inc.,* 72 F.3d 1294, 1304 (7th Cir.1995) (applying Illinois law); *Matter of P & E Boat Rentals, Inc.,* 928 F.2d 662, 665 (5th Cir.1991) (applying Louisiana law); *Matter of Estate of Katchatag,* 907 P.2d 458, 464 (Alaska 1995); *Scolinos v. Kolts,* 37 Cal.App.4th 635, 639–40, 44 Cal.Rptr.2d 31 (Cal.App. 2 Dist.1995); *Peterson v. Anderson,* 155 Ariz. 108, 745 P.2d 166, 169 (1987); *Belli v. Shaw,* 98 Wash.2d 569, 657 P.2d 315, 319 (1983).

Nevada addressed the issue of the enforceability of a contract that violated Nevada's attorney ethics rules in *Shimrak,* 912 P.2d at 824–26. In *Shimrak,* a private investigator entered into a contract for his services with an attorney for which he was to be paid a flat per hour rate plus 10% of attorneys' fees collected on each case. *Id.* The investigator sued for payment on his services, but the attorney argued that because Nevada Supreme Court rules prohibit attorneys from splitting fees with non-attorneys, the contract was void as against public policy, and unenforceable. *Id.* The Nevada Supreme Court appeared to accept the general premise that contracts in violation of the ethical rules would be void and unenforceable, but held that the contract was enforceable in this case. *Id.* at 825–26. First, the Court noted that the investigator was not an attorney and thus not bound by the ethical rules. *Id.* Consequently, he had not engaged in any

illegal or unethical behavior. *Id.* Second, the Court found it would be inequitable to allow the attorney to benefit from free investigative services because he violated the ethical rules. *Id.* at 826.

With respect to fee splitting between attorneys, Nevada Supreme Court Rule 155 prohibits attorneys from different firms from splitting fees unless:

(a) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation;

(b) The client is advised in writing of and does not object to the participation of all the lawyers involved; and

(c) The total fee is reasonable.

The prohibition against fee sharing arises from concerns that "the public loses confidence in those who treat clients as merchandise in a marketplace rather than the recipients of the attorneys' skills and abilities." *Baer,* 72 F.3d at 1303 n. 10 (quotation omitted). Referral fees may jeopardize the client's best interests "when it becomes more profitable for attorneys to sell clients than to give them a legal service." *Id.* (quotation omitted). "Additionally, if an attorney must share a portion of the fees received from certain clients, but not others, he may be tempted to devote less time and attention to the cases of the clients whose fees must be shared; the client, as a result, may not receive the best efforts of his attorney on his case." *Id.*

Although Crockett contends the alleged referral fee in this case would violate Nevada's ethical rules for attorneys, both Crockett and Fitzgerald steadfastly maintain that Nevada disciplinary rules permit the payment of referral fees between attorneys. Although Crockett denies he agreed to a referral fee in this case, he states in an affidavit that his "general practice" with respect to referral fees is to pay one third of his normal 40% contingency fee as a "straight referral fee" with the client's written consent. (Pls.'/Counterdefs.' Reply in Supp. of Mot. to Dismiss, Ex. A at ¶ 4.) At oral argument, Crockett's counsel argued referral fees are permitted under Rule 155(a) so long as the fee is in proportion to the services provided, and Fitzgerald's counsel asserted referral fees are common practice among Nevada attorneys, including his own firm.

Other jurisdictions are divided on whether referral fees are permitted under the prevailing professional rule, or whether such agreements are permissible under certain circumstances. *See* 28 A.L.R.4th 665 (collecting cases). At least one jurisdiction, Illinois, explicitly permits referral fees under its rules of professional conduct, so long as the client agrees in writing, the details of the fee division are disclosed, the referring lawyer agrees to assume the same legal responsibility for the performance of the services in question as would a partner of the receiving lawyer, and the total fee is reasonable. *See* Ill. Sup.Ct. R. of Prof. Conduct 1.5.

The Nevada Supreme Court has not specifically addressed whether referral fees ever are appropriate under Rule 155 or Rule 196(15). *See* Nev. Sup.Ct. R. 196(15) (prohibiting a lawyer from giving "anything of value to a person for recommending the lawyer's services, except that a lawyer may pay the reasonable cost of advertising or written or recorded communication permitted by these rules and may pay the usual charges of a lawyer referral service or other legal service organization"). Additionally, if Crockett and Fitzgerald are correct that a referral fee does not violate Nevada's ethical rules, the Nevada Supreme Court has given no indication of how a court is to determine what percentage of recovery is in proportion to the services provided by the referring at-

torney under Rule 155(a). Crockett asserts his firm's normal practice is one-third of 40%, or 13⅓%. Fitzgerald, on the other hand, seeks 50% of fees for the referral plus the services he performed in the Nostro case.

■ Finding no guiding precedent in Nevada's case law, and a split of authority among jurisdictions based on variously worded ethical rules, this Court is reluctant to speculate how the Nevada Supreme Court would rule on the propriety of referral fees or what factors Nevada would use to decide whether a referral fee is "in proportion" to the services provided. Such important matters governing the conduct of the legal profession in Nevada are most appropriately addressed in the first instance by the Nevada Supreme Court. These issues present one of the relatively uncommon instances in which this Court deems it appropriate to consider certification to the Nevada Supreme Court in accord with Rule 5 of the Nevada Rules of Appellate Procedure.

Pursuant to Nevada Rule of Appellate Procedure 5, the Nevada Supreme Court may answer questions of law certified to it by a United States District Court upon the certifying court's request:

if there are involved in any proceeding before those courts questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court of this state.

Nev. R.App. P. 5(a). A certifying court may invoke Rule 5 upon its own motion. Nev. R.App. P. 5(b). A certification order must include:

(1) [t]he questions of law to be answered; (2)[a] statement of all facts relevant to the questions certified and showing fully the nature of the controversy in which the questions arose;

(3)[t]he names of the appellant and respondent; (4)[t]he names and addresses of counsel for the appellant and respondent; and (5)[a]ny other matters that the certifying court deems relevant to a determination of the questions certified.

Nev. R.App. P. 5(c).

Among the questions the Court is inclined to certify to the Nevada Supreme Court are the following:

1. Is payment of a referral fee from one attorney to another for referring a client permitted under Nevada Supreme Court Rules 155 and 196(15)?

2. If a referral fee between attorneys is a violation of Nevada's rules governing attorney conduct, is an agreement between attorneys for a referral fee unenforceable as against public policy where the dispute is between only the attorneys, and enforcing the agreement will not increase the client's overall fee?

3. If a referral fee between attorneys is not a violation of Nevada's rules governing attorney conduct, what criteria should a court use to determine whether a referral fee is proportionate to the services provided?

This Court recognizes that the parties have not been given the opportunity to brief the question of certification to the Nevada Supreme Court, nor have they had the opportunity to provide input in crafting the questions to be certified. As a result, it is appropriate to allow the parties to meet and confer, and to present this Court with supplemental briefs addressing the issue of certification to the Nevada Supreme Court in accord with Rule 5 of the Nevada Rules of Appellate Procedure and their specific proposals as to questions to be certified. Such supplemental briefs shall be filed on or before December 22, 2005.

**B. Breach of the Covenant of Good Faith and Fair Dealing, Unjust Enrichment, Declaratory Judgment, and Constructive Trust**

Fitzgerald also brings claims for breach of the covenant of good faith and fair dealing, unjust enrichment, declaratory judgment, and a constructive trust over the disputed funds. Crockett moves to dismiss these claims, arguing Fitzgerald's only viable theory of recovery is quantum meruit.

Because the existence of an enforceable contract and the parties' legal rights in relation to the alleged oral agreement for a referral fee may be affected by the Nevada Supreme Court's answers to the certified questions, the Court will deny the remainder of Crockett's motion without prejudice.

## III. CONCLUSION

IT IS THEREFORE ORDERED that Plaintiffs'/Counterdefendants' Motion to Dismiss Defendants'/Counterclaimants' Counterclaims Pursuant to FRCP 12(b)(6) (Doc. # 7) is hereby GRANTED to the extent that Defendants'/Counterclaimants' claim for breach of contract under the Retainer Agreement is hereby dismissed. The remainder of the Motion is denied without prejudice pending the resolution of the issue of certification of questions to the Nevada Supreme Court.

IT IS FURTHER ORDERED that Defendants'/Counterclaimants' shall have until December 22, 2005 to file an amended Countercomplaint adding specific allegations supporting a claim for breach of an oral agreement for a referral fee.

IT IS FURTHER ORDERED that the parties shall forthwith meet and confer, and on or before December 22, 2005, shall file supplemental briefs regarding the certification of relevant questions to the Nevada Supreme Court in accord with Rule 5 of the Nevada Rules of Appellate Procedure.