# United States Court of Appeals
## For the First Circuit

Nos. 11-1619, 12-1098

CYNTHIA JACKSON, as Administratrix of
the Estate of Leonard J. Giguere,

Plaintiff, Appellant,

v.

UNITED STATES,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Stahl, Circuit Judges.

Brian P. Burke for appellant.
Anton P. Giedt, Assistant United States Attorney, with whom
Rayford A. Farquhar, Assistant United States Attorney, and Carmen
Milagros Ortiz, United States Attorney, were on brief, for
appellee.

February 12, 2013

**LYNCH**, **Chief Judge**.  Leonard Giguere served his country in the U.S. Army in the Vietnam War.  He was injured there in a landmine explosion, causing a diaphragmatic hernia which affected the arrangement of some of his internal organs.  That rearrangement would have consequences four decades later.  On May 6, 2005, at age 58, Giguere underwent surgery at the Veterans Administration Hospital ("VA Hospital") in West Roxbury, Massachusetts.  He died on May 10, 2005.

Giguere's estate brought a medical malpractice claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346.  After a five-day bench trial, the court entered judgment for the United States with extensive findings of fact and conclusions of law.  See Jackson v. United States (Jackson I), No. 08-40024-FDS (D. Mass. Mar. 25, 2011).  The court later denied a motion for new trial, see Jackson v. United States (Jackson II), No. 08-40024-FDS, 2011 WL 6301425 (D. Mass. Dec. 15, 2011), and amended its previous findings and conclusions, see Jackson v. United States (Jackson III), No. 08-40024-FDS, 2011 WL 6300996 (D. Mass. Dec. 15, 2011).

On appeal, the estate asserts that the court committed an error of law as to the standard of care it used, abused its discretion as to several of its evidentiary rulings, and made factual findings that the evidence did not support.  We conclude that the district court did not err and affirm its judgment.

-2-

I.

Decedent Giguere served in the U.S. Army in the Vietnam War. There, he was injured by a landmine explosion that caused him to suffer a diaphragmatic hernia. As a result, a portion of Giguere's stomach and his upper intestines moved from his stomach cavity into the chest cavity where his heart and lungs were located. Giguere's esophagus thus did not run downward from his mouth to his stomach, but was bent into an acute angle.

On May 4, 2005, Giguere, then 58 years old, was admitted to the VA Hospital, complaining of exhaustion, chest tightness, and elevated blood pressure. VA Hospital staff determined that Giguere had suffered a heart attack and that he had severe systemic heart disease posing a constant threat to life, which necessitated coronary artery bypass graft ("CABG") surgery. CT scans revealed Giguere's diaphragmatic hernia, and Giguere's cardiothoracic surgeon, Dr. Michael Crittenden, determined that the hernia would not pose significant operative or postoperative difficulties. Giguere was administered anesthesia and underwent CABG surgery on May 6, 2005. The surgery was performed without complications.

An endotracheal tube was inserted into Giguere's lungs during his surgery, then anesthesiologists attempted to insert a nasogastric ("NG") tube into Giguere's stomach to prevent aspiration (vomiting into the lungs) during the removal of the endotracheal tube. The anesthesiologists were not able to place

-3-

the NG tube into Giguere's stomach, and later that day Dr. Crittenden was unable to correctly re-position the NG tube in Giguere's stomach. Dr. Crittenden concluded that Giguere's unusual anatomy was preventing the NG tube's insertion and that further attempts would present risks to Giguere, including the risk of perforation, infection, and a need for further surgery.

On May 7, 2005, Giguere's endotracheal tube was removed without incident. By that evening, Giguere appeared to be recovering normally. At 6:30 p.m., on May 7, another surgical resident ordered that Giguere's diet be "advanced as tolerated," meaning Giguere would be given clear liquids, then full liquids, and then a regular cardiac diet -- a low-fat, low-sodium, low-cholesterol meal -- if each were tolerated.

On the morning of May 8, Giguere appeared to be tolerating clear liquids and also to be recovering from his surgery; he was able to get out of bed and walk briefly. However, symptoms of an ileus -- failure of liquids and solids to progress along the digestive tract -- began showing that morning. Cessation of digestive function is common after patients are administered general anesthesia, but an adynamic ileus occurs when digestive function does not return after a normal recovery period. An adynamic ileus can lead to distention and rupture of the stomach and intestines, cut-off of blood supply leading to tissue death, and vomiting and aspiration. A cardiac patient with Giguere's

-4-

anatomical configuration is also at risk that an ileus will cause cardiopulmonary stress.

On the morning of May 8, x-rays and Giguere's difficulty in breathing suggested that he might have developed an ileus. Dr. Crittenden believed Giguere's gastrointestinal function was returning because he was passing gas, making bowel sounds, ambulating, and taking fluids. To treat symptoms of an ileus, physicians can usually insert an NG tube into the stomach to evacuate its contents and relieve distention. However, Dr. Crittenden was concerned that attempting to insert an NG tube into Giguere's stomach might perforate his esophagus.

At 7:00 p.m. on May 8, Nurse John O'Sullivan recorded that Giguere consumed 60% of his diet and 200 cc's of clear liquids. West Roxbury VA Hospital Nurse Kathleen Doherty stated in her deposition that this notation meant Giguere was given solid food. The government did not call O'Sullivan at trial, but Doherty testified at trial that Giguere could not have been given solid food that evening because no order for solid food had been sent to the VA Hospital kitchen via the hospital's computerized system.

On May 9, x-rays taken at 5:30 a.m. and 9:15 a.m. showed no significant changes in the condition of Giguere's ileus. Giguere was transferred to a step-down postsurgical unit at 10:00 a.m. that morning. Over the next three hours, nurses recorded that Giguere's abdomen was distended and taut, that he was short of

breath and experiencing heartburn, that his heart rate was elevated, and that he reported feeling very full.

At 1:15 p.m. on May 9, Giguere began vomiting, which relieved his heartburn. Dr. Crittenden had become concerned that Giguere had developed an ileus that would not resolve, and at 1:30 p.m. he ordered a consultation with the gastroenterology ("GI") department. In response, gastroenterologist Elihu Schimmel and GI resident Reina Pai examined Giguere and concluded he had bypassed the need for an NG tube because he had been passing gas and having bowel movements. Dr. Schimmel was not aware that Giguere had vomited, which would have temporarily decompressed his stomach.

Throughout the evening of May 9, Giguere experienced nausea, vomiting, distention, increased heart rate, and difficulty breathing. At 8:50 a.m. on the morning of May 10, Drs. Schimmel and Pai visited Giguere again, noted his worsening condition, and recommended that an NG tube be placed fluoroscopically (using a moving x-ray image) to decompress Giguere's stomach. At 9:00 a.m., Giguere was taken to the VA Hospital radiology department, where a radiologist, Stephen Gerzof, attempted to insert an NG tube into Giguere's stomach fluoroscopically. Dr. Gerzof twice tried to advance the tube, but each time Giguere began vomiting and Dr. Gerzof halted the procedure.

Dr. Gerzof then attempted to use a J-tipped guide wire, inserted down the NG tube, to help him navigate the tube past the

-6-

curve in Giguere's esophagus.  As Dr. Gerzof attempted to advance the wire through the NG tube, Giguere began vomiting, his blood pressure dropped, he stopped breathing, and he went into cardiac arrest.  Dr. Gerzof called an emergency code and surgical staff responded, but they were unable to revive Giguere, who was pronounced dead at 11:10 a.m. on May 10.

On May 11, an autopsy was conducted on Giguere at which Drs. Crittenden and Gerzof were present.  The cause of death was determined to be:

> Cardiac arrest: acute left ventricular myocardial infarction (hours to days), Hypostatic, compressed left lung[.]  Secondary to gastric and colonic eventration through non-patent left diaphragm hiatus, secondary to abdominal ileus of right colon with gaseous obstipation and abdominal pressure.

On May 18, the VA Hospital's surgical service held a weekly review of medical outcomes -- a Surgical Service Quality Improvement Conference ("SSQIC") -- at which Giguere's case was discussed.  The surgical service staff then prepared a written evaluation of Giguere's care and treatment (the "SSQIC Comments").

## II.

Cynthia Jackson, one of Giguere's two daughters, brought suit against the United States as administratrix of Giguere's estate on February 14, 2008, asserting claims under the FTCA for Giguere's wrongful death, as well as for his conscious pain, suffering, and emotional distress.

-7-

On July 10, 2009, the estate moved to compel production of the SSQIC Comments. The government opposed the motion, contending that the SSQIC Comments were protected under 38 U.S.C. § 5705 and 38 C.F.R. § 17.501 as documents produced in a focused review. The district court referred the estate's motion to a magistrate judge, who ordered the Government to produce an unredacted version of the SSQIC Comments. The magistrate judge concluded that SSQIC Comments did not comply with Veterans Health Administration ("VHA") Directive 2004-054 because some, but not all, pages of the document were marked as confidential, which the magistrate judge considered to be a precondition to assert the privilege. The government objected to this order, and on April 2, 2010, the district court reversed.

A bench trial commenced on April 12, 2010 and concluded on April 16, 2010. At trial, plaintiff's expert witness, Andrew Warner, M.D., testified that Giguere's post-surgical treatment at the VA Hospital fell below the standard of care. Dr. Warner stated that an ileus posed a greater risk to Giguere because his abdominal organs were pressing against his lungs. He opined that when Dr. Crittenden was unable to insert an NG tube into Giguere on May 6, the tube should have been inserted endoscopically (using a small optical camera) or fluoroscopically. Dr. Warner also stated that Giguere should not have been given anything to eat or drink after

he exhibited signs of an ileus, and that giving food and drink to Giguere likely exacerbated his bowel distention.

The government's expert witness, James Richter, M.D., testified that a post-operative ileus almost always resolves in a few days, and that feeding a patient and having a patient move around usually helps an ileus to resolve. Dr. Richter also testified that Giguere faced "an underlying constant threat to his life" from his heart disease, and that advancing an NG tube into Giguere's stomach was contraindicated because of the risk of perforation and bleeding. Dr. Richter testified, over objection, that endoscopic placement of an NG tube posed the same risks; he also testified that endoscopic placement would require infusing air into Giguere, which might compromise his ability to expand his lungs. The estate objected to Dr. Richter's testimony on this point because the government did not provide notice in its expert report that Dr. Richter would testify regarding endoscopy. The district court allowed Dr. Richter's testimony, but permitted the estate to supplement the record if necessary. The estate submitted a rebuttal affidavit from Dr. Warner in which he stated that he had routinely placed NG tubes endoscopically in patients with hernias.

After trial, on March 25, 2011, the district court concluded that "[w]ith the benefit of hindsight, it seems likely that a different course of treatment might have led to a different outcome," and that "Mr. Giguere may have received less-than-perfect

care." Jackson I, slip op. at 3. However, the court concluded that "the conservative approach adopted by the VA physicians did not breach the standard of care," id. at 4, and entered judgment for the United States. The estate filed a motion for a new trial on April 25, 2011, and then filed a notice of appeal from the district court's judgment on May 26, 2011. On December 15, 2011, the district court denied the estate's motion but made minor amendments to its findings of fact and conclusions of law. Jackson II, 2011 WL 6301425, at *4 n.2, *7, *11; see also Jackson III, 2011 WL 6300996. On January 13, 2012, the estate filed a second notice of appeal.

III.

A.      The District Court's Application of the Standard of Care

The estate opens with the legal argument that the district court employed an erroneous standard of care. The estate is wrong. Under Massachusetts law, "the standard of care is based on the care that the average qualified physician would provide in similar circumstances." Palandjian v. Foster, 842 N.E.2d 916, 920-21 (Mass. 2006). The estate argues that the district court erred by failing to consider Giguere's "particular circumstances." The district court explicitly qualified each of its findings as to the quality of Giguere's care by stating that Giguere's physicians did not violate the standard of care "under the circumstances." Jackson I, slip op. at 26-27, 29, 30; Jackson III, 2011 WL 6300996,

at *17-19.  Each finding was preceded by a detailed discussion of the particular circumstances of Giguere's case.

The estate's real argument is that the district court clearly erred in finding that Dr. Crittenden did not violate the standard of care by not inserting an NG tube between May 6 and May 10, 2005.  The estate argues that "Dr. Warner testified [that] NG tube placement for postoperative patients with hiatal hernia is easily accomplished using endoscopy" (emphasis added).  But that testimony hardly shows error.  Dr. Richter testified that "there was a 'reasonable likelihood' . . . that the ileus would resolve on its own," and that "the option of inserting a tube endoscopically into the stomach raised risks of perforation and bleeding as well as other risks associated with topical anesthesia and infusion of air."  Jackson I, slip op. at 26; Jackson III, 2011 WL 6300996, at *16.  There were two differing expert opinions regarding the necessity and risks of endoscopically inserting an NG tube into Giguere.  Where, as here, "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985).

B.      Challenges to the District Court's Findings of Fact

       1.      The District Court's Factual Finding That Giguere Had Not Been Given Solid Food

The court found that "Mr. Giguere was never served, and did not eat, solid food while at the West Roxbury VA."  Jackson I,

-11-

slip op. at 13; Jackson III, 2011 WL 6300996, at *8. The estate argues that this finding was important because Dr. Warner testified that giving Giguere solid food after he showed signs of an ileus breached the standard of care. However, Dr. Richter testified that feeding a patient who had developed an ileus was recommended because it usually helped an ileus to resolve. In any event, the estate argues that the district court's finding was clearly erroneous, but its argument is based on two sets of equivocal or conflicting testimony.

First, Dr. Schimmel recorded in his notes and testified that Giguere was "eating." But he testified that he never determined if Giguere "was eating solids or only liquids" and that liquids could include Jell-O. The estate's expert, Dr. Warner, agreed that the term "eat" does not "presume the intake of something solid," and that "eating" "could be liquid; it could be full liquids; it could be soft solids."

Second, nurse John O'Sullivan recorded that Giguere consumed 60% of his "diet" and 200 cc's of clear liquids on the evening of May 8, 2005. Nurse Doherty testified at trial that this meant that Giguere "had 60 percent of the full liquids that was [sic] on his tray," and the district court found that "[a]lthough it is unclear, it is likely that nurse O'Sullivan intended to indicate that Mr. Giguere ate 60% of a full liquid tray and 200 cc's of clear liquids." Jackson I, slip op. at 13; Jackson III,

-12-

2011 WL 6300996, at *8. The estate notes that other nurses at the VA Hospital who had given Giguere meals recorded the amounts of liquids consumed using cubic centimeters, not as a percentage of the meal, but Doherty explained that "[p]eople chart different." The estate also notes that Doherty agreed in her deposition that Giguere "was eating solid food by the end of your shift on May 8th." But at trial, Doherty explained that she did not recall this statement, and that Giguere could not have been given solid food that evening because the VA Hospital's computerized system did not reflect that an order for solid food had gone to the kitchen.

The district court explained that its finding was "[b]ased on the evidence as a whole —- including the medical records as interpreted in light of the trial testimony, and the Court's observations of Nurse Doherty's testimony as a witness." Jackson II, 2011 WL 6301425, at *4. A "reviewing court must give due regard to the trial court's opportunity to judge the witness's credibility." Fed. R. Civ. P. 52(a)(6). Given the conflicting evidence at trial, we are not left here with "the definite and firm conviction that a mistake has been committed." Anderson, 470 U.S. at 573 (quoting United States v. U.S. Gypsum Co., 33 U.S. 364, 395 (1948)) (internal quotation mark omitted).

2. The Court's Findings As To Dr. Gerzof's Testimony

In ruling upon the estate's motion for a new trial, the district court amended its findings to read: "After reviewing the

-13-

CT scans of Mr. Giguere's stomach and colon, Dr. Gerzof believed that he could 'push and push' an NG tube, but that '[i]t would never go anywhere,' given the unusual anatomy of Mr. Giguere's intestinal tract." Jackson II, 2011 WL 6301425, at *7 (alteration in original); Jackson III, 2011 WL 6300996, at *12 (alteration in original). The estate argues on appeal that this finding is still clearly erroneous, since "Dr. Gerzof was [sic] actually testified that [he] felt he could not insert an NG tube without a J tip guide wire." The district court's finding accurately represented Dr. Gerzof's testimony, which explained that he "tr[ied] to insert that J wire rather than just continuing with the NG tube" because "I felt that I could push and push that tube. It would never go anywhere." Moreover, the district court's ruling on the estate's motion for a new trial makes clear that the court did not take Dr. Gerzof's testimony to mean that the NG tube could not be advanced even if a J tip guide wire were used. See Jackson II, 2011 WL 6301425, at *6-7.

C.      Admission of Dr. Richter's Testimony on Endoscopic Placement of an NG Tube

Next, the estate argues that the district court erred in permitting Dr. Richter to "offer[] testimony regarding the safety of an endoscopic NG tube insertion" when he "fail[ed] to even mention the issue in his expert report even after it was discussed in Jackson's expert report." "[R]eview of decisions to admit

expert testimony is for abuse of discretion." Mitchell v. United States, 141 F.3d 8, 13 (1st Cir. 1998).

The Government conceded at trial that Dr. Richter's expert report did not "mention or rebut the endoscopy argument that Dr. Warner makes." Even if Dr. Richter's report failed to include "a complete statement of all opinions the witness will express and the basis and reasons for them," Fed. R. Civ. P. 26(a)(2)(B)(i), the government was permitted to present the omitted testimony from Dr. Richter so long as "the failure was substantially justified or is harmless," Fed. R. Civ. P. 37(c)(1). Moreover, we "look[] to a variety of factors in assessing a claim of error under Rule 26," including "the ability of the [opposing party] to formulate a response." Curet-Velázquez v. ACEMLA de P.R., Inc., 656 F.3d 47, 56 (1st Cir. 2011) (alteration in original) (quoting Licciardi v. TIG Ins. Grp., 140 F.3d 357, 363 (1st Cir. 1998)) (internal quotation mark omitted).

In overruling the estate's objection to Dr. Richter's testimony, the district court stated that "I'm going to allow some testimony as to what those risks were, and if it's necessary before the evidence closes in fairness to permit either additional time to the plaintiff or -- or rebuttal testimony, we'll take that up at a later time." At the close of evidence, the district court told the estate's counsel that "[i]f you want to file a motion to supplement the record in some way in that regard or to add additional

evidence, I will entertain it."  The estate's counsel responded that he "found Dr. Richter to be helpful in some regards." Nonetheless, the estate later submitted a rebuttal affidavit from Dr. Warner that the district court admitted into evidence.

The estate argues that it was prejudiced by its inability to present this response in the form of live testimony, claiming that because Dr. Warner's rebuttal affidavit was not cited in the district court's findings of fact and conclusions of law, "it is impossible to conclude that this critical piece of testimony . . . was given any deliberation, let alone the thoughtful consideration it deserved."  The key opinions that the estate identifies in the rebuttal affidavit were presented by Dr. Warner at trial, and the district court described this testimony in its findings of fact and conclusions of law.  Jackson I, slip op. at 24; Jackson III, 2011 WL 6300996, at *15.  The district court was under no obligation to cite both Dr. Warner's live testimony and his rebuttal affidavit regarding these issues.

Since the estate was given an opportunity "to formulate a response" to Dr. Richter's testimony, Curet-Velázquez, 656 F.3d at 56, and has demonstrated no prejudice from the admission of this testimony, there was no abuse of discretion here.

D.      Denial of Plaintiff's Motion to Compel Production of a Privileged and Confidential Document

The district court overruled the magistrate judge's determination that the VA Hospital was required to produce the

-16-

SSQIC Comments. The magistrate judge had determined that the four-page document did not comply with VHA Directive 2004-054 because only its first two pages were marked as confidential, and that the document was therefore not privileged.

38 U.S.C. § 5705 and 38 C.F.R. § 17.501 together make documents produced by the VA at focused reviews confidential and privileged. The estate argues that although "the weekly surgical review constituted a privileged Focused Review," the VA waived privilege because the VA Hospital "failed to comply with its agency's own directives because only the first page of these [SSQIC Comments] contained 'language mandating protection,'" as VHA Directive 2004-054 required, and that therefore no privilege attached.

The Acting Under Secretary for Health of the VHA issued VHA Directive 2004-054 on September 29, 2004, and it expired on July 31, 2009. VHA Directive 2004-054(g)(5)(c) states that:

> Protected peer review documents for quality improvement include all reviews of patient care by an individual provider that are performed for the purpose of improving the quality of health care and/or improving the utilization of health care resources. In order for the documents generated by a peer review to be protected confidential [sic] under 38 U.S.C. § 5705, and its implementing regulations, each peer review must be designated in writing as being conducted and/or prepared for quality improvement and/or resource utilization purposes prior to the initiation of the peer review. This designation can be issued by the Under Secretary for Health (for all VHA facilities), by a Veterans Integrated Services Network (VISN) Director (for VHA facilities within that VISN), and/or by the facility Director (for the individual facility).

-17-

1. Language mandating protection under 38 U.S.C. § 5705 (such as the language in following subpar. 2g(5)(c)2) must be clearly and visibly placed on every page of every document to be made confidential.

2. All documents associated with this activity need to be treated as strictly confidential, unless determined otherwise after careful review (with documentation) by qualified VHA personnel. The following statement is recommended for required documentation . . .

The district court correctly ruled that:

VHA Directive 2004-054 indicates that privileged documents should be marked on every page. The obvious purpose of that requirement is to ensure that such documents are appropriately identified, so that they are not inadvertently produced or intermingled with nonprivileged documents. There is no indication that the VHA (or Congress) intended that an otherwise-privileged document should lose its protection because of a minor clerical error in marking the document.

Nothing in the language of the directive mandates that we conclude, as the estate would have us do, that where a four-page document is clearly marked on its first two pages as confidential, confidentiality is lost as to the remaining pages. VHA Directive 2004-054(g)(5)(c)(1) and (2), when read together, demonstrate that the requirement imposed was a clerical one meant to ensure that documents were not "inadvertently produced or intermingled." The estate does not argue that 38 U.S.C. § 5705 and 38 C.F.R. § 17.501 -- which extend privilege and confidentiality to all documents resulting from protected activities -- do not apply to the SSQIC Comments. There was no risk of confusion or prejudice. The argument is without merit.

-18-

IV.

The judgment of the district court is <u>affirmed</u>.  No costs are awarded.