# United States Court of Appeals
## For the First Circuit

No. 14-1001

LAW OFFICES OF DAVID EFRON,

Appellant,

v.

MATTHEWS & FULLMER LAW FIRM; CARLOS R. IGUINA-OHARRIZ;
HATUEY A. INFANTE-CASTELLANOS,

Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Silvia Carreño-Coll, U.S. Magistrate Judge]

Before

Lynch, Chief Judge,
Howard and Kayatta, Circuit Judges.

David Efron and Law Offices of David Efron, P.C., on brief for appellant.
Toby B. Fullmer, Matthews & Fullmer, L.L.C., Hatuey A. Infante-Castellanos, and Hatuey Infante Law Offices, P.S.C., on brief for appellees.

April 1, 2015

**KAYATTA, Circuit Judge**.  This appeal arises out of a dispute between two law firms over how to split attorneys' fees due them as a result of their mutual clients' recovery in the personal injury lawsuit that gave rise to this action.  The appellant, the Law Offices of David Efron ("Efron"),[1] expresses unhappiness with the 40 percent share the district court awarded to his firm.[2]  In support of Efron's request that we order the district court to reapportion the fees in some unspecified manner, he challenges the court's factual findings that he was not credible and that he intended to mislead the court about his fee agreement with pro hac vice counsel Toby Fullmer ("Fullmer"), of the law firm Matthews & Fullmer.  Efron also challenges the court's ex parte communication with the plaintiffs in order to resolve a dispute about which lawyer represented them.  After determining that the district court had ancillary jurisdiction over the attorneys' fees dispute, and finding no error at all in the district court's analysis or conduct, we affirm.

---

[1]  We use "Efron" to refer collectively to the attorney and his law firm.  The conduct of Efron the individual is primarily at issue in this appeal.

[2]  The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c)(1).  Because the magistrate judge had authority to "conduct any or all proceedings" in the matter, id., we refer to relevant rulings as those of "the district court," or simply "the court."

## I.  Background

In 2008, plaintiff Orlando Alejandro-Ortiz ("Alejandro") suffered injuries from an electrical shock as he attempted to move a downed power line.  Alejandro-Ortiz v. P.R. Elec. Power Auth., 756 F.3d 23, 25 (1st Cir. 2014).  Alejandro, along with his wife Sonia Rodríguez-Jimenez ("Rodríguez") and their two minor children (collectively, "plaintiffs"), retained the Texas law firm Matthews & Fullmer to represent them in a lawsuit against Puerto Rico Electric Power Authority ("PREPA") and its insurer.  On March 30, 2010, Matthews & Fullmer entered into a "joint venture agreement" with Efron that provided that Efron would perform local counsel duties in exchange for 20 percent of the attorneys' fees.

Several weeks before trial in 2012, Fullmer informed Efron that Matthews & Fullmer could not try the case.  Efron therefore tried the case and obtained a judgment for the plaintiffs in the amounts of $2,025,000 for Alejandro, $855,000 for Rodríguez, and $292,500 for each of the two minor children.  The district court later reduced the amount due Alejandro and the children to $1,000,000 in light of a settlement agreement between those three plaintiffs and PREPA's insurer.  PREPA successfully appealed the award to plaintiff Rodríguez.  Alejandro-Ortiz, 756 F.3d at 30.

Meanwhile, in the wake of the judgment, the relationship between Efron and Matthews & Fullmer deteriorated, with their clients becoming ping-pong balls in a contest between counsel.

-3-

Matthews & Fullmer tried to fire Efron as local counsel in this case and two others. Efron parried the move by getting the plaintiffs to fire Matthews & Fullmer. Fullmer then convinced the plaintiffs to undue the firing (and to fire Efron instead).

These events bounced onto the district court docket on October 3, 2013, when appellees Carlos Iguina-Oharriz ("Iguina") and Hatuey Infante-Castellanos ("Infante"), having been retained by Matthews & Fullmer as new local counsel, filed a motion for leave to appear as substitute local counsel for the plaintiffs. The next day, Efron filed a motion to disqualify substitute local counsel and Matthews & Fullmer, or, alternatively, for an attorney's lien for 80 percent of the attorneys' fees. Efron's motion explained that he "had expressed and verbally agreed, not in writing," with Matthews & Fullmer that Efron would receive 80 percent of the attorneys' fees "because of the additional work and responsibility in this case[,] including trial."

In response to these dueling motions, the district court understandably found itself unclear as to who--if anyone--represented the plaintiffs, and whether the plaintiffs were being protected as counsel fought with one another. The court issued the following order:

> The Court is deeply concerned about the serious allegations being made among Plaintiffs' putative attorneys. . . . On the basis of the record now before us--and particularly given the serial, competing revocations and grants of power of attorney--

-4-

we are incapable of determining Plaintiffs' true intent, and we cannot trust the claims of any of the attorneys now purporting to represent them. Accordingly, <u>all</u> of those attorneys . . . are hereby ORDERED to immediately cease communicating with Plaintiffs without <u>express</u>, <u>prior</u> consent from this Court. . . .

Given the serious charges being leveled, Plaintiffs' important rights that must be protected, and the risk of improper influence being exercised upon Plaintiffs, the Court intends to communicate, <u>ex parte</u>, with Plaintiffs, in an attempt to determine if and when they might be available to attend a hearing. . . .

These post-judgment uncertainties posed a pressing problem because PREPA, in response to a writ of execution issued by the court, was prepared to pay the $1,000,000 owed to three of the plaintiffs. Indeed, it appears that it was counsels' conflicting desires to get their hands on this imminent payment that brought the dispute to a head. Fullmer held out his hand by writing a letter--which he subsequently filed with the court along with the motion to substitute local counsel--to PREPA's counsel informing him that Efron no longer represented the plaintiffs and that PREPA should send the check to Infante or Iguina. Faced with the possibility that $1,000,000 could end up with an attorney who did not represent the plaintiffs, the district court sensibly instructed PREPA "to deposit any funds in satisfaction of the $1,000,000 judgment with the Court's registry, where it will be

held in an interest-bearing account until such time as Plaintiffs' representation is settled."

The district court next ordered Efron and Fullmer to appear at a hearing so that, "before making any further ruling, the Court [could] hear from the attorneys purporting to represent Plaintiffs." The court also informed Efron and Fullmer that "[t]he Court has personally spoken twice with Plaintiff Sonia Rodríguez-Jimenez, and based on those conversations we do not believe it necessary at this time to appoint a special master or to have Plaintiffs appear before the Court."

At the hearing, the district court inquired about two issues: the events that led to the termination of Efron as local counsel, and the status of the fee-sharing agreement between Efron and Matthews & Fullmer. Fullmer described the conduct that led to his firm's decision to terminate Efron as local counsel on three cases, including Efron's decision to file a brief in this underlying case without allowing Fullmer to read it first. Fullmer admitted that he attempted to negotiate a new fee-sharing arrangement with Efron, but he denied that they ever reached an agreement. In response, Efron speculated that Matthews & Fullmer wanted him off the case in order to claim a larger share of the attorneys' fees and as an effort to dodge a garnishment order served on Efron by a judgment creditor of the Texas firm. As for the fee division between the attorneys, Efron claimed that he would

not have agreed to try the case for less than the "lion's share" of the fees.

On October 23, 2013, the district court entered an order declaring that Matthews & Fullmer would continue to represent the plaintiffs, with Iguina and Infante serving as substitute local counsel. <u>Alejandro-Ortiz</u> v. <u>P.R. Elec. Power Auth.</u>, Civ. No. 10-1320(SCC), 2013 WL 5755358, at *7 (D.P.R. Oct. 23, 2013). The order terminated Efron's representation and prohibited Efron from contacting the plaintiffs. <u>Id.</u> The district court nonetheless awarded Efron 40 percent of the attorneys' fees.[3] <u>Id.</u> The court found that Efron and Fullmer never modified the original 20-80 arrangement in the March 30, 2010, joint venture agreement, but also found that Efron was entitled to more than 20 percent on a quantum meruit basis for the unanticipated work he performed in trying the case. <u>Id.</u> at *5-6.

Efron filed a Rule 59(e) motion asking the district court to amend or omit certain findings in its October 23 order. Those findings indicated that Efron made misleading statements and was not credible with respect to aspects of his dispute with Fullmer. While his motion was pending, Efron appealed to this court. The district court then denied the Rule 59(e) motion, defending its findings on Efron's credibility as both necessary and well-founded.

---

[3] While this appeal was pending, the district court disbursed 40 percent of the attorneys' fees, or $126,093.23, to Efron's law firm.

-7-

## II.  Analysis

Efron raises three issues on appeal.  First, he contests the district court's findings with respect to his credibility and attempts to mislead the court.  Second, he claims that he is entitled to more than 40 percent of the attorneys' fees.  Third, he complains about the district court's ex parte communication with plaintiff Rodríguez.  After determining that the district court had jurisdiction, we address each argument in turn.

## A.   Ancillary Jurisdiction over the Fee Dispute

First, we must determine whether the district court correctly concluded that it had subject matter jurisdiction to decide what is essentially a private contract dispute between non-parties.  Although neither side raises the issue on appeal, we have an obligation to make such a determination sua sponte.  McCulloch v. Vélez, 364 F.3d 1, 5 (1st Cir. 2004).  We review issues of jurisdiction de novo.  Cooper v. Charter Comms. Entertainments I, LLC, 760 F.3d 103, 105 (1st Cir. 2014).

At first glance, it seems like diversity could have provided an independent basis for the district court's jurisdiction over a sizable fee dispute between a Texas law firm and local counsel in Puerto Rico.  See 28 U.S.C. § 1332.  The district court did not assess its jurisdiction under the diversity rubric, however, and the record on appeal provides insufficient jurisdictional facts for this court to make a determination.  Also,

the probable Puerto Rican citizenship and potential indispensability of new local counsel Infante and Iguina, to whom part of Matthews & Fullmer's fee would be due, cast some doubt on the existence of diversity jurisdiction. Picciotto v. Cont'l Cas. Co., 512 F.3d 9, 15-19 (1st Cir. 2008).

We therefore look to the possibility of jurisdiction ancillary to the court's jurisdiction over the underlying suit. Federal courts have often exercised authority under the doctrine of ancillary jurisdiction to resolve fee disputes between parties and their attorneys that arise out of the underlying litigation. Rivera-Domenech v. Calvesbert Law Offices PSC, 402 F.3d 246, 250 (1st Cir. 2005) (per curiam) (dictum); see also Exact Software N. Am., Inc. v. DeMoisey, 718 F.3d 535, 542 (6th Cir. 2013) (collecting cases) ("For years, indeed since the early years of the republic, federal courts have resolved fee disputes between lawyers and their clients when those disputes arise out of the underlying case . . . ."); 13 Wright & Miller, Federal Practice & Procedure § 3523.2 (3d ed.) ("One of the best-established uses of ancillary jurisdiction is over proceedings concerning costs and attorneys' fees."). One broad purpose of such jurisdiction is "to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 380 (1994).

Whether federal courts also have ancillary jurisdiction over fee disputes between attorneys who represented the same client, especially when the client was not a party to the lawyers' fee-sharing agreement, is less clear. In one important respect, a dispute between counsel who claim collectively more than the total amount of fees owed by the client is much like a dispute between the lawyers and the client because, until it is resolved, the presence of competing and inconsistent attorneys' liens may hinder the client's receipt of the amount due the client. Even without consideration of this possible impact on the client, other circuits have found ancillary jurisdiction over disputes among counsel when the funds subject to the dispute are in the court's control. Compare Baer v. First Options of Chicago, Inc., 72 F.3d 1294, 1298, 1301 (7th Cir. 1995) (district court had ancillary jurisdiction to decide a referral fee dispute between attorneys, when the settlement approved by the court contained terms for calculating the fees and the disputed amount was held in an escrow account by the clerk of court); and Grimes v. Chrysler Motors Corp., 565 F.2d 841, 844 (2d Cir. 1977) (per curiam) (court had ancillary jurisdiction to decide a fee dispute between trial counsel and attorney of record after the court approved the settlement, because the settlement funds were in the court's registry and therefore within its control); with Taylor v. Kelsey, 666 F.2d 53, 54 (4th Cir. 1981) (per curiam) (no ancillary jurisdiction existed over a

"purely" private contract dispute between an attorney and former co-counsel, because the fee dispute had no effect on the outcome of the litigation or the recovery of the plaintiffs, and the court did not have control over the disputed funds).

Efron's fee dispute did not arise in the course of enforcing or approving a settlement agreement, as was the case in Grimes and Baer, but it did emerge in direct response to the court's decision to allow partial execution on its judgment. The district court needed to resolve the ancillary fee dispute in order to complete the execution on the underlying judgment. See Kokkonen, 511 U.S. at 381. The district court's control over $1,000,000 of the partially executed judgment therefore conferred authority to determine the proper recipients of those funds in order to conclude the court's responsibilities in the underlying action. See Baer, 72 F.3d at 1301; Grimes, 565 F.2d at 844.

**B. Findings on Credibility and Misleading Statements**

Efron first challenges the district court's findings that he attempted to mislead the court and that he was not credible. Those challenged findings addressed three representations that Efron made to the court: (1) that he and Matthews & Fullmer "had expressed and verbally agreed" that Efron would receive 80 percent of the fee award; (2) that Efron did not put the revised fee agreement in writing because he trusted Fullmer; and (3) that Efron's Spanish-speaking attorneys, and not Matthews & Fullmer,

-11-

facilitated preparation for the trial because the plaintiffs "speak little or no English."  Efron made the first and third statements in his motion, and the second at the hearing.

During the hearing, Fullmer testified that he denied Efron's request for an 80 percent fee because Fullmer's firm bore the financial risk of the case by paying more than $100,000 in litigation expenses.  Fullmer countered with alternative fee divisions of "30-70, 40-60, 50-50," but "[Efron] didn't want those," and never accepted any counteroffer.  Fullmer also argued that "had there been [a modified fee agreement], any attorney would have sought that in writing."  With respect to communicating with the plaintiffs, Fullmer told the court that plaintiff Rodríguez "speaks great English," and that he "always talked with her."  This testimony by Fullmer provided ample support for the district court's finding that the agreement alleged by Efron did not exist.

But there was more.  Efron's own testimony belied his prior representations to the court.  Instead of backing up his claim that there was an express verbal agreement that Efron would receive 80 percent of the attorneys' fees, Efron fell back to saying only that there was an "implicit" agreement that he would receive "the lion's share."  In fact, Efron admitted that Fullmer never agreed to change the fee-sharing agreement: "[w]e tried to come to an agreement with [Fullmer].  He would have nothing to do with it.  He insisted that it was 20% and the last thing he said,

and I was very sorry to hear that from him, was '[w]e'll have to let the Court decide.'" In short, Efron's testimony materially fell short of the assertion made in his motion that he and Fullmer "had expressed and verbally agreed" that Efron would keep 80 percent of the fee.

Given the foregoing testimony, the district court as factfinder clearly had ample basis to find, as it did, "that Efron's comments in his motion about an express verbal contract were meant to mislead the Court." Alejandro-Ortiz, 2013 WL 5755358, at *3.

The district court did not believe Efron on two other points. The court found that "Efron's statement that he did not ask for the [fee] agreement in writing because he 'trusted' Fullmer [was] not credible or believable," because "both attorneys seem sufficiently competent not to have acted in such a manner." Id. And, in light of Efron's misleading statements about the fee agreement and English-language text messages between Efron's associate and plaintiff Rodríguez, the district court (which had spoken directly to one of the plaintiffs) was also "forced to conclude that Efron was purposefully misleading the Court" when he represented that the plaintiffs "speak little or no English." Id. at *4.

Efron complains that these unflattering findings were unnecessary dicta and ought to be amended or stricken from the

-13-

order. Efron never articulates a basis for such relief, and instead simply labels the court's findings dicta, "misrepresent[ing] . . . the facts," and evidence of the district court's personal bias against him.

The simple response is that, if the challenged findings were truly only dicta, we would likely not review them on appeal. See In re Williams, 156 F.3d 86, 92 (1st Cir. 1998) ("[C]ritical comments made in the course of a trial court's wonted functions--say, factfinding or opinion writing--do not constitute a sanction and provide no independent basis for an appeal."). The more direct response is that these are precisely the kind of findings that courts or juries make in deciding disputes of this type. Efron's credibility was relevant, especially in resolving the "he said, he said" dispute between Efron and Fullmer. And the evidence presented to the court--including Efron's own internally inconsistent story--clearly provided the necessary support for its adverse findings that Efron was not credible and had tried to mislead the court. See Ryan v. Astra Tech, Inc., 772 F.3d 50, 61-62 (1st Cir. 2014) (district court properly disbelieved the accuracy of a sanctioned attorney's version of events in part because the lawyer's "account of the events and his actions . . . d[id] not inspire confidence in his truthfulness").

Efron seems to forget that, in this dispute, he played the role of a party and a witness. He should hardly be surprised

that the district court made routine fact-finding judgments about the credibility of the assertions he made in direct support of his claim for more money.  District courts do this every day.  See, e.g., Jackson v. United States, 708 F.3d 23, 30-31 (1st Cir. 2013); Sheppard v. River Valley Fitness One, L.P., 428 F.3d 1, 5 (1st Cir. 2005).  And we review such findings deferentially, especially when they bear on credibility.  Jennings v. Jones, 587 F.3d 430, 444 (1st Cir. 2009) ("District court determinations of credibility are of course entitled to great deference.").  Similarly, as a party asking the court, in effect, to equitably apportion fees to him in excess of the portion specified in his contract, he can hardly complain that the district court paid attention to his care and good faith in representing facts to the court.  See Texaco P.R., Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 880 (1st Cir. 1995) (describing equitable doctrine of unclean hands).  For all of these reasons, there is no basis to disturb the district court's findings.[4]

---

[4]  To the extent Efron challenges the district court's statements on the basis that they reflect bias, his argument is utterly without merit.  Efron did not seek the magistrate judge's recusal, and in fact affirmatively waived any claim of bias by stating, in his motion for reconsideration, that "Efron does not seek to recuse or disqualify the [magistrate judge] based on bias or prejudice."  See United States v. Rodriquez, 311 F.3d 435, 437 (1st Cir. 2002) ("A party waives a right when he intentionally relinquishes or abandons it.").  Even if Efron had not waived any claim of bias, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings . . . do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or

## C.    Attorneys' Fees Apportionment

Having rejected Efron's claim that the lawyers made any agreement regarding fees other than the agreement that allotted 20 percent to Efron, the district court nevertheless awarded Efron 40 percent of the fees.  In doing so, the district court concluded that the lawyers' agreement did not anticipate or address the roles ultimately assumed, and that the added work Efron performed merited a 40 percent share of the fees.  Fullmer has not appealed this equitable adjustment.  Efron, though, has, claiming that he should have received more.

It is hard to imagine our overturning such an inherently discretionary equitable apportionment by the district court.  See Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir. 1992) ("[B]ecause determination of the extent of a reasonable fee necessarily involves a series of judgment calls, an appellate court is far more likely to defer to the trial court in reviewing fee computations than in many other situations.").  Just as the court noted that Efron did more than local counsel would normally do, so too it observed how Matthews & Fullmer "participated to a significant degree . . . from [the case's] inception up until trial, including

_____

antagonism that would make fair judgment impossible."  Liteky v. United States, 510 U.S. 540, 555 (1994).  Rather than antagonism, the district court displayed patience and balance in resolving a difficult and unusual problem, and it explained that it "thought long and hard about whether [the words the court used] were proper and warranted, and [it] employed them reluctantly."

-16-

by preparing and filing motions and securing experts," and continued to bear the financial risk of receiving no compensation for the litigation expenses it had paid. <u>Alejandro-Ortiz</u>, 2013 WL 5755358, at *6.

Efron himself points to no other specific, more appropriate apportionment, nor does he explain why the 40 percent award is so indefensible as to be vulnerable to the limited review applicable here. The argument in Efron's opening brief consists of a reference to the abuse of discretion standard of review, a conclusory statement that "[s]imply put, the Magistrate's resolution of the finances of this case are [sic] wrong," and irrelevant digressions.[5] Efron does tell us that he once received 80 percent of the attorneys' fees for a medical malpractice case referred to him by Matthews & Fullmer and for which he served as lead counsel from the outset. Of course, that one data point is not an apt comparison for this case, in which Matthews & Fullmer played a significant role. Efron also latches onto Fullmer's suggestion during the hearing that Fullmer offered and Efron rejected a 50-50 share, but Efron fails to explain why he should now benefit from a bargain he once rejected. Such a perfunctory

---

[5] Efron attempts to assert the right of Matthews & Fullmer's alleged judgment creditor to garnish Matthews & Fullmer's portion of the fee. Of course, as Efron acknowledges, that dispute is "not [his] fight." A quick glance at the district court docket after this appeal was filed assures us that the creditor appears more than capable of asserting its own rights.

-17-

effort on appeal borders on waiver.  See Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011) ("It should go without saying that we deem waived claims not made or claims adverted to in a cursory fashion, unaccompanied by developed argument."); Harriman v. Hancock Cnty., 627 F.3d 22, 28 (1st Cir. 2010) (appellant waived issues when he "correctly identifie[d] the standard of review, but that [was] about all").  Waived or not, Efron's argument fails to show that the district court abused its discretion in determining the relative value of Efron's legal services.

D.   **The District Court's Ex Parte Communication**

Efron's final claim of error is that the district court's communication with plaintiff Rodríguez violated the prohibition on ex parte communications in Canon 3(A)(4) of the Code of Conduct for United States Judges.[6]  At no time did Efron object to the district

---

[6] Canon 3(A)(4) reads in relevant part as follows:

> A judge should accord to every person who has a legal interest in a proceeding, and that person's lawyer, the full right to be heard according to law. Except as set out below, a judge should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers. . . .  A judge may:
>
> . . . .
>
> (b) when circumstances require it, permit ex parte communication for scheduling,

-18-

court's announced intention to communicate ex parte with the plaintiffs, or to the communication itself. We therefore review for plain error, a standard that requires Efron to show, among other things, a clear or obvious error that affected his substantial rights. Dávila v. Corporación de P.R. para la Difusión Pública, 498 F.3d 9, 14-15 (1st Cir. 2007).

Of course, this appeal is not a judicial disciplinary proceeding. It therefore makes no difference on this appeal whether the district court violated the pertinent canon unless that violation somehow could have tainted the judgment from which Efron appeals. Efron, in turn, points to no such plausible nexus, and instead merely asserts in a conclusory form that such a supposed violation infringed on his due process rights. How this is so-- much less plainly so--we are left to guess.

In any event, we can easily cut to the chase and reject Efron's argument on its merits. The canon allows ex parte communications "for scheduling, administrative, or emergency purposes . . . if the ex parte communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage." Code

---

administrative, or emergency purposes, but only if the ex parte communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication.

of Conduct for United States Judges Canon 3(A)(4)(b).  The district court clearly faced an emergency: the plaintiffs' local and pro hac vice counsel were at odds over who actually represented the plaintiffs.  Nor did the district court's communication with the plaintiffs have anything to do with the substance of the underlying case or even the ancillary matter of the fee division between Efron and Matthews & Fullmer.  Given that the district court announced its intention to talk to the plaintiffs, and no one objected, we cannot see how the court possibly violated Canon 3(A)(4), let alone clearly or obviously violated it in a manner that caused improper prejudice to Efron in this case.

Efron also claims that the ex parte communications violated his due process rights in connection with disciplinary proceedings[7] instituted against Efron as a result of his conduct in a different case.  How that may be so, we have no idea, and Efron again does not enlighten us.  In any event, that argument about another case is irrelevant to the issues before us now.

---

[7] Efron asked to file a sealed addendum with court documents from that disciplinary proceeding and which are not a part of the district court record for this appeal.  A duty panel of this court deferred a decision on whether to take judicial notice of these documents to the merits panel.  Because the sealed documents are not relevant to the issues on this appeal, we decline to take judicial notice.  Kowalski v. Gagne, 914 F.2d 299, 305 (1st Cir. 1990) ("It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand.").

## III. Conclusion

Finding no fault with the district court's conduct and rulings, we <u>affirm</u> the district court's October 23, 2013, order.